UNITED STATES, Appellee,

v.

Thomas A. SHAY, Defendant–Appellant.

No. 93–2141.

United States Court of Appeals,
First Circuit.

Heard Oct. 10, 1994.

Decided June 22, 1995.

See also 1993 WL 263493.

Kathy B. Weinman, Boston, MA, by Appointment of the Court, with whom Amy Baron–Evans, and Dwyer & Collora were on brief for appellant.

Frank A. Libby, Jr., Asst. U.S. Atty., with whom Donald K. Stern, U.S. Atty., and Paul V. Kelly, Asst. U.S. Atty., Washington, DC, were on brief for appellee.

Before TORRUELLA, Chief Judge, BOUDIN, Circuit Judge, and BARBADORO,* District Judge.

BARBADORO, District Judge.

Thomas Shay Jr. was found guilty of conspiracy and aiding and abetting an attempt to blow up his father's car. In proving its case, the government relied in part on incriminating statements that Shay Jr. made to the police, the media, and fellow inmates. The defendant responded by arguing that his statements were unreliable and should be disregarded. In this opinion, we determine whether the court properly prevented the defendant from supporting his argument by calling a psychiatrist to testify that he suffered from a mental disorder that causes its victims to make false and grandiose statements without regard to the consequences. We also address various other issues that the defendant raises on appeal.

## I. BACKGROUND

### A. The Explosion

Two officers from the Boston Police Department Bomb Squad were sent to the home of Shay Jr.'s father, Thomas Shay Sr., after Shay Sr. informed the police that he had discovered a suspicious black box in his driveway that had become dislodged from the undercarriage of his car. While the officers were examining the box, it exploded, killing Officer Jeremiah Hurley and seriously wounding Officer Frances Foley. Agents from the Bureau of Alcohol, Tobacco and Firearms, working with the Boston Police Department, later determined that the box contained two to three sticks of repackaged dynamite, a remote control device and other components necessary to detonate the bomb from a remote location.

### B. The Government's Case

The government's trial theory was that Shay Jr. conspired with a friend, Alfred Trenkler, to kill Shay Jr.'s father by blowing up his car. In proving its case, the government relied primarily on several incriminating statements that Shay Jr. made after the bombing. We describe his most damaging statements to illustrate their importance to the government's case.

1. Shortly after the bombing, Shay Jr. told a police officer, "he was sorry about it and wished he could turn back the hands of time and make it not have happened." The government argued at trial that this statement was evidence of Shay Jr.'s guilty conscience.

2. Shay Jr. told reporters covering the bombing that he had been questioned about whether his father was capable of constructing a remote control device. Because the police claimed that they did not question Shay Jr. about the bomb's remote control detonator until after Shay Jr. made this statement, the government argued that the statement demonstrated that Shay Jr. had special knowledge about the bomb that only a co-conspirator would possess.

3. Shay Jr. gave an interview to a television reporter in which he made several statements concerning the bombing. Although he claimed in the interview that he was only guilty of knowing who had built the bomb after-the-fact, he admitted that Trenkler had told him before the bombing that he was planning a "surprise" for Shay Jr., which turned out to be the bomb. Shay Jr. also acknowledged during the interview that he had purchased a toggle switch and an "AA" battery holder that Trenkler had used in building the bomb.

* Of the District of New Hampshire, sitting by designation.

4. Shay Jr. allegedly told a fellow cellmate, "I'm boom, boom. Don't you know me? You have to know me. I'm the one who killed the Boston cop." According to the cellmate, Shay Jr. also told him that he and Trenkler had built the bomb together and attached it to the undercarriage of his father's car.

The government supported Shay Jr.'s incriminating statements about the bombing with other evidence that: (a) Trenkler and Shay Jr. were friends who were in sporadic contact from 1988 through the fall of 1991; (b) Trenkler had the skill to construct the bomb; (c) gray duct tape consistent with that in the bomb was discovered in a search of Trenkler's parents' residence; (d) ten days prior to the explosion, someone purchased a toggle switch and "AA" battery holder of the same type used in the bomb from a Radio Shack store located directly across the street from where Trenkler was working; (e) Radio Shack's records listed the purchaser's name as "SAHY," and his identification number corresponding to the last four digits of his telephone number as "3780," which was similar to the last four digits of Shay Sr.'s home telephone number, "7380"; (f) Shay Jr. was strongly motivated to kill his father because they had a difficult "love-hate" relationship, and Shay Jr. believed that he would collect a substantial inheritance if his father were killed; and (g) Shay Jr. demonstrated consciousness of guilt by fleeing the jurisdiction after he was released on bail following his arrest on an unrelated matter.

## C. *The Defendant's Case*

Shay Jr. responded to the government's case by arguing that his statements about

the bombing were unreliable, that the rest of the evidence failed to establish his guilt, and that other evidence suggested that Shay Sr. may have built the bomb. His attack on the statements comprised three parts. First, in an effort to demonstrate that he made the statements in order to fulfill a compulsive need for attention even though they were false, the defense elicited testimony from several witnesses that Shay Jr. regularly told the same grandiose stories, often changing significant details each time he told them; repeatedly sought out the media to talk about the bombing even though it was not in his interest to do so; made comments concerning the police investigation which were not confirmed by the police; and expressed abnormal interest in the media attention he received as a result of his statements.

Second, the defense attempted to show that Shay Jr.'s many statements about the bombing were conflicting and demonstrably wrong about important details that would have been known by a coconspirator. In other words, as defense counsel stated in her summation, "[Shay Jr.] may be trying to talk about this crime, but he doesn't make it. He can't pull it off. He doesn't have the facts right." To illustrate this point, the defense pointed to Shay Jr.'s repeated and incorrect statements that the bomb contained C–4 explosive (or plastique) and batteries purchased from Radio Shack.

Finally, the defense attempted to call Dr. Robert Phillips, a psychiatrist, who was prepared to testify that Shay Jr. suffered from a recognized mental disorder known as "pseudologia fantastica."[1] According to Dr. Phillips, this condition caused Shay Jr. to

1. Pseudologia fantastica is categorized as a factitious disorder in the Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1987) ["DSMIII–R"] and is sometimes referred to as Munchausen's Disease named after Baron von Munchausen who was a German storyteller who wandered the countryside spinning tall tales.

    Pseudologia fantastica is a variant of lying, often characterized as an extreme form of pathological lying. R. Sharrock and M. Cresswell, *Pseudologia Fantastica: A Case Study of a Man Charged with Murder*, 29 Med.Sci.Law. 323, 323 (1989). Unlike "con-men" whose lying is for the purpose of some material gain, victims of this condition present falsifications that are " 'dispro-

portionate to any discernable end.' " *Id.* Pseudologues represent fantasies as real occurrences. "These fantasies often involve dramatic, grandiose, and exaggerated events consciously acknowledged as false by the patient, yet presented as truth." Charles W. Dithrich, *Pseudologia Fantastica, Dissociation, and Potential Space, in Child Treatment*, 72 Int.J.Psycho.Anal. 657, 657 (1991). "External reality is negated by an enthralling, seductive and exciting inner world in which anything is possible." *Id.* at 658. The gain for the pseudologue could be ego enhancement or the attention received as a result of the story. Sharrock and Cresswell, *supra* at 323. Many lie for no apparent reason, in circum-

spin out webs of lies which are ordinarily self-aggrandizing and serve to place him in the center of attention. Put otherwise, coping for Mr. Shay, given his personality structure, entails seeking attention, tailoring his words to the audience, creating fantasies in which he is the central figure, and through which he attempts to enlist his audience.... Mr. Shay's stories are an attempt to draw others into his fantasy world in order to meet the interpersonal needs which were not met during his childhood.

The district court prevented the defense from offering this testimony, concluding that the evidence should be excluded pursuant to Fed.R.Evid. 702 primarily because the jury was capable of determining the reliability of Shay Jr.'s statements without the testimony.[2]

stances where they have nothing to gain from not telling the truth. Anne Vaughan, "Believe me—I cannot tell the truth," The Independent, July 9, 1991, at 13.

Pseudologues are also often highly compliant and suggestible to misleading information. Sharrock and Cresswell, *supra* at 323. " 'They are often histrionic or suggestible types who thrive on attention and lie for a quick high ... and don't worry about the consequences.' " Vaughan, *supra*. Furthermore, even when they are confronted with their lies, many pseudologues are unable to control their lies. *Id.*

As noted by one doctor, "[i]t is quite common for people suffering from pseudologia fantastica to turn up at a police station confessing to a crime they did not commit. Usually these have been high-profile, well-publicized cases such as bank robberies. This group of pseudologues loves the excitement and power that helping the police brings. It makes them feel important and they relish all the attention and fame that they receive from the case ...'." *Id.*

2. The court offered the following explanation:

With respect to the psychiatric expert offered by the defendant, as I understand that, it is offered to show that the defendant has an uncontrollable need to draw attention to himself and will say anything to satisfy his need, and in particular, it is offered to explain away his inculpatory statement. Under 702 expert evidence is admissible to assist the jury to understand evidence or to determine a fact in issue. The record in this case is replete with the defendant's contradictory statements, indeed, his fantastic ones about tanks and bombers, and other things.

Under these circumstances, the jury does not need expert evidence on the issue of the defendant's credibility. And there is, with respect to this evidence, the additional danger that the expert will go beyond the brief references to—I

## II. DISCUSSION

### A. Exclusion of Expert Testimony Concerning the Reliability of Shay Jr.'s Statements

██ In preventing Dr. Phillips from testifying, the district court relied on its discretionary authority pursuant to Fed.R.Evid. 702 to exclude expert testimony that will not "assist the trier of fact to understand the evidence or to determine a fact in issue." Shay Jr. contends that the decision was based upon an erroneous interpretation of Rule 702.[3] The government argues that the district court did not abuse its discretion in excluding the evidence and alternatively asserts that the court was obligated to exclude the evidence as a matter of law because it

think it's called—pseudologiafantastica [sic] in the areas that are in fact inadmissible such as diminished capacity, personality, deficit, and so on.

The quintessential question is whether the jury will believe what the defendant says, and on that question, given this record, the jury does not need any additional expert evidence or any expert evidence. Accordingly, I will rule out the defendant's proffer on that issue, and your objection is noted as is the Government's.

3. Shay Jr. also argues that the exclusion of Dr. Phillips's testimony violated his Sixth Amendment right to present a complete defense. The Sixth Amendment's Compulsory Process Clause has been interpreted to entitle a defendant to both " 'the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt.' " *Taylor v. Illinois*, 484 U.S. 400, 408, 108 S.Ct. 646, 652, 98 L.Ed.2d 798 (1988) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56, 107 S.Ct. 989, 1000–01, 94 L.Ed.2d 40 (1987)). Nevertheless, the right to present evidence is not unlimited. *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor*, 484 U.S. at 410, 108 S.Ct. at 653–54. We need not define the outer limits of Shay Jr.'s Sixth Amendment rights in order to decide the present case because, at least in this instance, the Sixth Amendment offers Shay Jr. no greater protection than the rules of evidence. *See United States v. Fosher*, 590 F.2d 381, 384 n. 2 (1st Cir.1979) (right to compulsory process does not include the right to adduce properly excluded evidence).

concerned a credibility question that was the jury's exclusive province to resolve. We first consider the government's argument for categorical exclusion.

### 1. Must expert testimony concerning credibility questions be excluded as a matter of law?

■ In arguing that expert testimony bearing directly on credibility questions is never admissible, the government relies on selected quotations from decisions in other circuits. *See, e.g., Bachman v. Leapley,* 953 F.2d 440, 441 (8th Cir.1992) ("It is the exclusive province of the jury to determine the believability of the witness ... [a]n expert is not permitted to offer an opinion as to the believability or truthfulness of a victim's story."); *United States v. Benson,* 941 F.2d 598, 604 (7th Cir.1991) ("[c]redibility is not a proper subject for expert testimony"), *modified,* 957 F.2d 301 (7th Cir.1992); *United States v. Barnard,* 490 F.2d 907, 912 (9th Cir.1973) ("[c]redibility, however, is for the jury—the jury is the lie detector in the courtroom"), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). We think the government makes too much of these decisions. Rather than requiring the wholesale exclusion of expert testimony concerning credibility issues, these cases stand for the more limited proposition that an expert's opinion that another witness is lying or telling the truth is ordinarily inadmissible pursuant to Rule 702 because the opinion exceeds the scope of the expert's specialized knowledge and therefore merely informs the jury that it should reach a particular conclusion. *See, e.g., Bachman,* 953 F.2d at 441; *Benson,* 941 F.2d at 604–05; *cf.* Fed.R.Evid. 704 advisory committee's note (evidence can be excluded pursuant to Rule 702 if it "would merely tell a jury what result to reach, somewhat in the manner of oath-helpers of an earlier day"). In the present case, the district court precluded Dr. Phillips from testifying rather than merely limiting his testimony to matters that were within the scope of his expertise. Thus, the decisions the government cites do not justify the court's ruling.

The government's position is further undermined by the rules themselves which recognize that expert testimony may be admitted to establish a witness's character for truthfulness. Fed.R.Evid. 402 provides that all relevant evidence is admissible unless its exclusion is required by the Constitution, an act of Congress, or another rule, and no constitutional provision, law, or rule requires the automatic exclusion of expert testimony simply because it concerns a credibility question. *See* Margaret Berger, *United States v. Scop: The Common–Law Approach to an Expert's Opinion About a Witness's Credibility Still Does Not Work,* 55 Brook.L.Rev. 558, 582–87 (1989). Moreover, Fed.R.Evid. 608(a), governing the admissibility of opinion testimony concerning a witness's character, contemplates that truthful or untruthful character may be proved by expert testimony. The advisory committee's note to Rule 608(a) references Fed.R.Evid. 405(a), which describes the acceptable methods for proving relevant character traits. Fed.R.Evid. 608 advisory committee's note. Rule 405's advisory committee's note, in turn, acknowledges that expert opinion testimony is to be included within Rule 405's scope. Fed.R.Evid. 405(a) advisory committee's note ("If character is defined as the kind of person one is, then account must be taken of the varying ways of arriving at the estimate. These may range from the opinion of the employer who has found the man honest to the opinion of the psychiatrist based upon examination and testing."). Thus, the Federal Rules of Evidence permit expert testimony to be offered in appropriate circumstances to establish a witness's truthful or untruthful character.[4]

■ The government's fall-back position is that even if expert testimony can be used to prove a testifying witness's untruthful character, it cannot be used to attack the reliabili-

---

4. Our decision in *United States v. Kepreos,* 759 F.2d 961 (1st Cir.), *cert. denied,* 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985), is not to the contrary. Although we noted in *Kepreos* that "there is no indication whatsoever that either the draftmen or Congress had in mind admitting evidence of broad psychological traits or clinical states such as 'repression' or 'dependency' or the other similar characteristics ...," our observation was expressly limited to broad and undefined psychological traits that were at issue in that case. *Id.* at 965.

ty of a defendant's out-of-court statements because the defendant is a declarant, not a testifying witness. This argument, too, is unavailing. · Fed.R.Evid. 806 provides that:

When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D) or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked, may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness.

Although the rule does not expressly include attempts to attack a defendant's out-of-court statements admitted pursuant to Fed.R.Evid. 801(d)(2)(A), the Senate Judiciary Committee's report concerning the proposed rules states:

The committee considered it unnecessary to include statements contained in Rule 801(d)(2)(A) and (B)—the statement by the party-opponent himself or the statement of which he has manifested his adoption—because the credibility of the party-opponent is always subject to an attack on his credibility.

S.Rep. No. 1277, 93d Cong., 2d Sess. (1974), U.S.Code Cong. & Admin.News, 1974, 7051, 7069. We agree with the Seventh Circuit Court of Appeals that the Senate Judiciary Committee's report correctly states the law. *United States v. Dent,* 984 F.2d 1453, 1460 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 169, 126 L.Ed.2d 129 (1993). Thus, we reject the government's argument for categorical exclusion and turn to the district court's reasons for excluding the evidence.

## 2. Did the district court properly exclude the psychiatrist's testimony pursuant to Rule 702?

A district court's decision to admit or exclude expert testimony is entitled to great deference. *United States v. Echeverri,* 982 F.2d 675, 680 (1st Cir.1993); *United States v. Hoffman,* 832 F.2d 1299, 1310 (1st Cir.1987). Thus, we will reverse a decision on this, or any other evidentiary question, only if: (1) the district court based the decision on an incorrect legal standard, *see United States v. Rahm,* 993 F.2d 1405, 1410 (9th Cir.1993); *United States v. Pelullo,* 964 F.2d 193, 198

(3d Cir.1992), or (2) we have a "definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors." *United States v. Benavente Gómez,* 921 F.2d 378, 384 (1st Cir.1990) (internal quotations and citations omitted). Applying this standard, we conclude that the district court erred in excluding Dr. Phillips's testimony pursuant to Rule 702.

### a. *Rule 702's Requirements*

Rule 702 consists of three distinct but related requirements. First, a proposed expert witness must be qualified to testify as an expert by "knowledge, skill, experience, training, or education." Fed.R.Evid. 702; *accord United States v. Paiva,* 892 F.2d 148, 160 (1st Cir.1989) ("a witness may qualify as an expert on any one of [Rule 702's] five listed grounds"). Second, the expert's testimony must concern "scientific, technical or other specialized knowledge." Fed.R.Evid. 702; *accord Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (describing criteria to be considered in determining reliability of scientific testimony). Finally, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702; *accord Daubert,* —— U.S. at ——, 113 S.Ct. at 2795. Since the district court did not question Dr. Phillips's qualifications or the specialized nature of his opinions, we focus our analysis on Rule 702's assistance requirement.

The fundamental question that a court must answer in determining whether a proposed expert's testimony will assist the trier of fact is " '[w]hether the untrained layman would be qualified to determine intelligently and to the best degree, the particular issue without enlightenment from those having a specialized understanding of the subject matter involved.' " *United States v. Montas,* 41 F.3d 775, 783 (1st Cir.1994) (quoting Fed. R.Evid. 702 advisory committee's note), *cert. denied,* —— U.S. ——, 115 S.Ct. 1986, 131 L.Ed.2d 873 (1995); *accord United States v. Lamattina,* 889 F.2d 1191, 1194 (1st Cir. 1989); *United States v. Rivera Rodríguez,* 808 F.2d 886, 888 (1st Cir.1986). In answer-

ing this question, the court must first determine whether the proposed testimony is relevant and fits the facts of the case.[5]  *Daubert,* — U.S. at — – —, 113 S.Ct. at 2795–96; *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d at 742–43.  The inquiry then shifts to whether the witness's opinions are based upon specialized skill, training, or experience.  *Benson,* 941 F.2d at 604; *cf. Daubert,* — U.S. at —, 113 S.Ct. at 2796 (relaxation of Fed. R.Evid. 602's first-hand knowledge requirement is justified for expert testimony because an "expert's opinion will have a reliable basis in the knowledge and experience of his discipline").  Unless the witness's opinions are informed by expertise, they are no more helpful than the opinions of a lay witness.  Thus, such opinions cannot be admitted pursuant to Rule 702 and instead must comply with the requirements of Fed.R.Evid. 701 governing the admissibility of opinion testimony by lay witnesses.  *See generally United States v. Jackman,* 48 F.3d 1, 4–5 (1st Cir.1995) (describing standard for admissibility of opinion testimony by lay witness).  This circuit has not decided whether, after *Daubert,* reliable testimony from a qualified expert may be deemed unhelpful under Rule 702 even if these aspects of the rule's assistance requirement are satisfied.  *But cf. In re Paoli R.R. Yard PCB Litig.,* 35 F.3d at 747 (noting that challenges to expert testimony as prejudicial must be analyzed pursuant to Rule 403 rather than Rule 702).  We need not resolve this question here because, as we describe in detail below, the district court's reasons for excluding the evidence are insufficient under any plausible reading of Rule 702.

**b.  *The District Court's Analysis***

■  Dr. Phillips was prepared to testify that Shay Jr. suffered from a mental disorder that caused him to make grandiose statements similar in nature to the statements that the government was seeking to use against him.  The district court excluded the testimony because it concluded that the testimony would not assist the jury in light of other evidence in the record concerning the reliability of Shay Jr.'s statements.  However, whether or not the jury had the capacity to *generally* assess the reliability of these statements in light of the other evidence in the case, it plainly was unqualified to determine without assistance the *particular* issue of whether Shay Jr. may have made false statements against his own interests because he suffered from a mental disorder.  Common understanding conforms to the notion that a person ordinarily does not make untruthful inculpatory statements.  *See* Fed. R.Evid. 804(b)(3) advisory committee's note (statements against interest are especially reliable because "persons do not make statements which are damaging to themselves unless satisfied for good reasons that they are true").  Dr. Phillips would have testified that, contrary to this common sense assumption, Shay Jr. suffered from a recognized mental disorder that caused him to make false statements even though they were inconsistent with his apparent self-interest.  Thus, Dr. Phillips was prepared to offer specialized opinion testimony, grounded in his expertise as a psychiatrist, that could have "explode[d] common myths" about evidence vital to the government's case.  *United States v. Moore,* 786 F.2d 1308, 1312 (5th Cir.1986) (citations omitted).  While the record contains other evidence that Shay Jr. told lies and boasted to an unusual degree, this evidence, standing alone, is much less powerful than the psychiatric testimony that Dr. Phillips was prepared to offer.  Moreover, the court did not express any concern that Dr. Phillips was unqualified or that his testimony was unreliable because it concerned some novel or ad hoc syndrome.  Under all of the circumstances, it was a clear

---

5.  The concept of "fit" requires that a valid connection exist between the expert's testimony and a disputed issue.  *Daubert,* — U.S. at —, 113 S.Ct. at 2796.  Judge Becker, who coined the term, illustrates the concept with the following example.  If a plaintiff contends that he or she developed cancer after being exposed to chemical X and seeks to support that contention with expert testimony that chemical X causes cancer in animals, the testimony will not fit the facts of the case and should be excluded unless the plaintiff also offers reliable expert testimony that results observed in the animal studies are transferable to humans.  *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 743 (3d Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995).

error in judgment for the district court to exclude the testimony under any plausible interpretation of Rule 702.[6]

### 3. Is a new trial required?

■ Although a court may not exclude expert testimony simply because it concerns a credibility question or because non-expert testimony was presented on the same issue, it retains ample discretion to exclude or limit such testimony for other reasons. Even if expert testimony is admissible pursuant to Rule 702, it may be disallowed pursuant to Fed.R.Evid. 403 if its prejudicial, misleading, wasteful, confusing, or cumulative nature substantially outweighs its probative value. As the Supreme Court recently observed, " '[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.' " *Id.* —— U.S. at ——, 113 S.Ct. at 2798 (quoting Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991)).

■ The government argues on appeal that the district court's decision should be affirmed because Dr. Phillips's testimony does not sufficiently fit the facts of the case and because the potential prejudice resulting from his testimony substantially outweighs its probative value. We are unable to address these arguments on the present record. The district court did not hold an evidentiary hearing on these issues, nor did the court make any findings that would support the exclusion of the evidence for the reasons cited by the government. Accordingly, the government's arguments must be addressed, in the first instance, by the district court on

remand. *See United States v. Streifel,* 781 F.2d 953, 958 (1st Cir.1986), *appeal after remand sub nom., United States v. Quinn,* 815 F.2d 153, 156 (1st Cir.1987).

■ Finally, we note that if the district court determines on remand that Dr. Phillips should have been permitted to testify, the exclusion of the testimony cannot be considered "harmless error." Although not all erroneous exclusions of evidence are harmful, where the exclusion "results in actual prejudice because it had a substantial and injurious effect or influence in determining the jury's verdict," reversal is required. *United States v. Legarda,* 17 F.3d 496, 499 (1st Cir.) (internal quotations and citations omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 81, 130 L.Ed.2d 34 (1994). Here, the statements at issue were vital to the government's case.[7] Moreover, although the court allowed Shay Jr. to indirectly attack the statements through other evidence, he was deprived of the opportunity to show that his statements were the unreliable product of a recognized mental disorder. Given the importance of the statements to the government's case and the severe restriction placed on Shay Jr.'s ability to challenge them, we cannot say that the exclusion of Dr. Phillips's testimony did not substantially influence the jury's verdict. *See id.; United States v. Versaint,* 849 F.2d 827, 832 (3d Cir.1988) (error not harmless where improperly excluded evidence went to heart of the defense); *United States v. Ouimette,* 753 F.2d 188, 193 (1st Cir.1985) (error not harmless because excluded testimony was "the core of the defendant's case").

### B. *Other Issues*

Shay Jr. argues that he is entitled to a new trial for several additional reasons. We examine these claims to determine whether a

---

**6.** The district court also expressed concern that Dr. Phillips should not testify because he might stray into the impermissible subject of Shay Jr.'s mental capacity to commit the crime. This concern, essentially that the testimony might have a prejudicial effect, must be addressed pursuant to Rule 403's balancing test rather than pursuant to Rule 702's helpfulness standard. *See Daubert,* —— U.S. at ——, 113 S.Ct. at 2798. Applying Rule 403, we conclude that the potential for prejudice cited by the court could have been

prevented by appropriate limitations on the scope of Dr. Phillips's testimony. Thus, the court's concern cannot serve as an independent basis for its decision.

**7.** The district court acknowledged the importance of the statements to the government's case at a side bar conference on the fourteenth day of trial when it observed that without Shay Jr.'s statements, "the government would be sunk."

new trial is warranted irrespective of whether the court erred in preventing Shay Jr. from offering expert testimony to attack his statements.

### 1. Shay Jr.'s communications with his former attorney

██ Shay Jr.'s former attorney, William McPhee, testified as a defense witness that he received a copy of the Radio Shack receipt from the government and gave it to Shay Jr. in May of 1992, prior to Shay Jr. making any statements about having purchased the items from Radio Shack. He was also permitted to testify that he and Shay Jr. had several discussions concerning the receipt. However, Shay Jr. claims that the district court improperly prevented McPhee from also testifying that Shay Jr. told him that he had never seen the Radio Shack receipt before May 1992. We conclude that Shay Jr. has forfeited his right to raise this contention on appeal because the record does not demonstrate that he adequately informed the court of the substance of the excluded evidence. *See* Fed.R.Evid. 103(a)(2).

McPhee's proposed testimony raised several evidentiary questions that the district court attempted to resolve in advance of his actual testimony. Of particular concern to defense counsel was the extent to which the court would deem McPhee's testimony to result in a waiver of the attorney-client privilege and open the door to cross-examination as to the substance of the communications. In arguing that the testimony would not waive the privilege, defense counsel repeatedly informed the court that she did not propose to ask McPhee to describe the substance of his conversations with Shay Jr. Further, in her voir dire examination, defense counsel, true to her word, limited her inquiry by not questioning McPhee concerning the substance of the communications.

McPhee's testimony before the jury followed the path traveled on voir dire. After handing McPhee the redacted copy of the Radio Shack receipt, defense counsel asked McPhee the following questions:

COUNSEL: And did you have one conversation with Mr. Shay on [the subject of the Radio Shack Receipt] or more than one conversation?

WITNESS: I had more than one conversation.

COUNSEL: Can you tell us 1, 2, 3, 4?

WITNESS: As many as I could focus Tom in on—

GOVT: Your honor, I object.

COURT: You can or can't recall, tell us.

WITNESS: I can't recall the exact number of conversations on the subject I had with Mr. Shay.

COUNSEL: But the subject of the conversation was—

GOVT: Objection to the subject of the conversation.

COURT: I think he already answered your question, Ms. Gertner. You may be going further than you really want to.

COUNSEL: I want to make sure that the subject of the repeated conversations was the Radio Shack—

GOVT: Your honor, I object to the substance of the conversation.

COURT: But you've already done it.

COUNSEL: I want to clarify that it was on the subject of this document.

GOVT: Objection.

COURT: The objection is sustained.

At no point did defense counsel inform the court that she planned to have McPhee testify that Shay Jr. had told him that he had never seen the Radio Shack receipt before receiving it from McPhee. To the contrary, counsel's representations, both before and during the testimony, led the district court to reasonably conclude that the additional testimony defense counsel sought to elicit would only concern matters that had already been adequately covered. Accordingly, Shay Jr. forfeited his right to challenge the excluded evidence on appeal by failing to inform the court in a timely manner of the substance of the excluded evidence. Fed.R.Evid. 103(a)(2); *United States v. Bonneau,* 970 F.2d 929, 933 (1st Cir.1992); *Earle v. Benoit,* 850 F.2d 836, 847–48 n. 13 (1st Cir.1988).

### 2. The adequacy of the jury instructions

██ Shay Jr. argues that the district court committed reversible error in failing to

instruct the jury in accordance with his proposed instruction concerning the reliability of his statements. Because Shay Jr. did not object to the court's failure to give the proposed instruction,[8] we review the issue for "plain error." *United States v. Nason,* 9 F.3d 155, 160–61 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1331, 127 L.Ed.2d 678 (1994).

■ Although a defendant has a right to an instruction on his theory of defense if that theory is valid and is supported by the record, *United States v. Flores,* 968 F.2d 1366, 1367 (1st Cir.1992), he "has no right to put words in the judge's mouth. So long as the charge sufficiently conveys the defendant's theory, it need not parrot the exact language that the defendant prefers." *United States v. McGill,* 953 F.2d 10, 12 (1st Cir.1992); *accord Nason,* 9 F.3d at 161 (reversible error only if instruction was substantially correct, was not covered in charge given, and failure to give it substantially impaired ability to present a defense). In the present case, the district court's instructions adequately covered the general subject of witness credibility and the specific subject of the reliability of Shay Jr.'s statements. Further, the instructions sufficiently conveyed the defendant's theory that based on the defendant's many contradictory statements, none of his statements should be found reliable. Under these circumstances, it was not plain error for the court to refuse to give the requested instructions.

### 3. Exclusion of expert testimony concerning diminished capacity

■ Shay Jr.'s principal trial theory was that he was uninvolved in the bombing.

Nevertheless, prior to trial, he filed a notice pursuant to Fed.R.Crim.P. 12.2 of his intention to offer expert testimony on the subjects of insanity and diminished capacity. In later seeking to obtain a favorable ruling on a motion in limine, however, Shay Jr. informed the court that his "lack of intent or knowledge [would not be] an issue." Moreover, after the court denied his motion for a bifurcated trial on the issue of insanity, defense counsel informed the court that "we will withdraw any questions about insanity because I believe quite clearly that it is not possible to defend on the merits and insanity at the same time." Notwithstanding these representations, Shay Jr. informed the court on the 16th day of trial that he might seek to offer evidence on the subject of diminished capacity. In prohibiting him from raising the issue, the court found that Shay Jr. had withdrawn his Rule 12.2 notice and that it would be "unfair to the government at this late date to suddenly change horses again." Shay Jr. challenges the court's finding that he withdrew his Rule 12.2 notice and therefore contends that the court erred in preventing him from offering expert testimony on the issue of diminished capacity.[9]

We review for abuse of discretion the trial court's determination that Shay Jr. withdrew his Rule 12.2 notice. *Cf. United States v. Cameron,* 907 F.2d 1051, 1057 (11th Cir.1990) (applying abuse of discretion standard to district court decision not to recognize defendant's notice under Rule 12). Since Shay Jr. informed the court after filing the Rule 12.2 notice that his knowledge or intent would not be an issue in the case and expressly withdrew his stated intention to pursue any issue of insanity, the record contains ample sup-

---

8. Fed.R.Crim.P. 30 provides in pertinent part: "No party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." Although the defendant made several objections to the charge, none of those objections addressed the court's instructions on witness credibility or the reliability of Shay Jr.'s statements.

9. We have previously held that psychiatric evidence of diminished mental capacity is inadmissible to negate mens rea. *United States v. White,* 766 F.2d 22, 24–25 (1st Cir.1985); *Kepreos,* 759 F.2d at 964. Although we have more recently suggested that we might be willing to reexamine this holding in light of recent precedents in other circuits, *United States v. López–Peña,* 912 F.2d 1536, 1541 (1st Cir.1989), *cert. denied,* 501 U.S. 1249, 111 S.Ct. 2886, 115 L.Ed.2d 1052 (1991), we need not do so here because we agree with the trial court that Shay Jr. withdrew his Rule 12.2 notice.

port for the district court's conclusion that Shay Jr. withdrew his Rule 12.2 notice. Moreover, since Shay Jr. did not restate his intention to pursue a diminished capacity defense until the trial was well underway, we take no issue with the court's conclusion that it would be unfair to the government to allow Shay Jr. to attempt to offer evidence on the subject of diminished capacity. Accordingly, we determine that the district court did not abuse its discretion in preventing Dr. Phillips from testifying on the subject of diminished capacity.[10]

## III. *CONCLUSION*

For the reasons described herein, the case is remanded to the district court for further proceedings consistent with this opinion.[11] We retain jurisdiction to review the district court's conclusion as to whether it should permit Dr. Phillips to testify.

---

**10.** Shay Jr.'s argument is also defective because he failed to make a timely offer of proof with respect to his diminished capacity evidence. *See* Fed.R.Evid. 103(a)(2). Although he produced a report from Dr. Phillips, that report did not discuss the subject of diminished capacity. Moreover, defense counsel made no other offer of proof concerning the evidence she proposed to offer on the subject. Accordingly, Shay Jr. forfeited his right to challenge the evidence on appeal. *Id.; accord Bonneau*, 970 F.2d at 933 ("A party may not claim that evidence was wrongly excluded unless the substance of the evidence was made known to the trial court or the offer was apparent from the context.").

**11.** In light of this result, we need not, at this point, reach defendant's sentencing arguments.