**UNITED STATES of America, Plaintiff,**

v.

**William L. SCHOLL, Defendant.**

**No. CR 95–576 TUC ROS.**

United States District Court, D. Arizona.

Feb. 27, 1997.

Robert J. Hirsh, Hirsh Davis Walker & Piccarreta, P.C., Stephen G. Ralls, Ralls & Bruner, P.C., Tucson, AZ, for William L. Scholl.

Thomas Lawrence Fink, U.S. Atty., Tucson, AZ, for U.S.

## OPINION

SILVER, District Judge.

On September 20, 1996, this Court issued an Order granting the Government's Motion to Preclude the Testimony of Doctor Robert Hunter except under limited circumstances. On September 24, 1996, the Court briefly set forth findings to guide the parties during the trial and promised a written Opinion would follow. This is that Opinion.

### I. FACTUAL OVERVIEW

The Government filed a Motion styled "Government's Motion in Limine to Preclude Expert Testimony—Compulsive Gambling Disorder." The Defendant filed a Response opposing the motion and a Supplement Memorandum on *Daubert*. The Government filed a Reply. A hearing was held on September 4, 1996, and Dr. Robert Hunter testified.

The parties argued the Motion, and the Court took it under advisement.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. General Legal Principles

The Supreme Court of the United States in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), set forth the guideposts for determining the admissibility of expert testimony. Of central significance was the Court's recognition both of the Federal Rules' "liberal thrust" with regard to the admissibility of expert testimony and the trial judge's "gate keeping" role vis-a-vis expert proof on scientific issues. *Id.* at 588, 597, 113 S.Ct. at 2794, 2798–99. The Supreme Court stressed that in the usual case the evaluation of expert testimony must be left to the jury but emphasized the trial court's important responsibility pursuant to Rule 104(a) of the Federal Rules of Evidence to screen scientific evidence in order to keep unreliable evidence out of the courtroom. *Id.* at 592–93, 113 S.Ct. at 2796–97.

After *Daubert* was decided, a debate arose over whether the new test would be more liberal (i.e., allow more expert testimony) or would be more conservative (i.e., allow less expert testimony).

> This question cannot be answered simply. The court cited the long accepted premise of the Federal Rules of Evidence to liberalize admissibility standards [citation omitted] but it adopted the most conservative test contained in the rules for preliminary assessments of fact.... Rule 104(a) mandates that judges independently determine the validity of the science underlying an expert's testimony.

David L. Faigman, *The Evidentiary Status of Social Science Under Daubert: Is it "Scientific," "Technical," or "Other" Knowledge?*, 1 Psychol. Pub. Pol'y & L. 960, 969 (Dec. 1995). The Ninth Circuit, however, has made clear that under *Daubert* judges must ask, "[w]here are the data?" An inability to produce it will result in exclusion of expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir.

1995). Hence, in a short time *Daubert* has become synonymous with validity and is generally referred to as the "validity" test. Faigman, *supra*, at 964.

Now, a district court's expert witness function is a two-step inquiry embodied in Federal Rule of Evidence 702, as follows:

1. To determine whether the expert has minimal educational experiential qualifications in a field that is relevant to a subject which will assist the trier of fact.
2. If the expert passes this threshold test the court should further compare the expert's area of expertise with the particular opinion the expert seeks to offer. Here the expert should be permitted to testify only if the expert's particular expertise however acquired enables the expert to give an opinion that is capable of assisting the trier of fact.

*See Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1269 (9th Cir.1994); *Carroll v. Otis Elevator*, 896 F.2d 210, 214–15 (7th Cir. 1990). The Supreme Court offered four nonexclusive factors which should be considered by trial courts in evaluating the merit of scientific evidence: falsifiability, error rate, peer review and publication and general acceptance. These criteria are more easily applied to the rigid sciences, but they have also been applied to the soft sciences such as psychology and psychiatry. One author states:

> By replacing Frye's general acceptance test with the validity standard of *Daubert* and Rule 702, the Supreme Court took a major step towards integrating the fields of law and psychology. Under *Daubert*, trial court judges no longer defer to the judgments of outsiders but, instead, bear the responsibility themselves for evaluating the scientific merit of the research underlying proffered expert testimony. For psychologists who in the past testified more on the basis of clinical consensus than rigorous research, *Daubert* is likely to constitute a *substantial road block.*
>
> An alternative view might assert that psychology avoids the strict censure of *Daubert* because if falls outside of science and that it should be admitted under the more relaxed standards presumably associated

with the other categories of expert testimony contemplated by Rule 702: "technical, or other specialized knowledge." I argue that psychology cannot avoid *Daubert* in this fashion, because 702 does not establish categories subject to alternative analysis. Instead, Rule 702 contemplates a fluid analysis, with a preference for scientific knowledge when it is or should be available.

Faigman, *supra*, at 979.

At the time of writing this Opinion there have been only a few cases involving psychiatric testimony since *Daubert*, and all of them have applied *Daubert* with varying results. In *United States v. Hall*, 93 F.3d 1337 (7th Cir.1996), the Seventh Circuit reversed the trial court's exclusion of the defendant's expert testimony regarding false confessions and the defendant's susceptibility to coercion. The psychiatrist would have testified that due to a personality disorder, which made him susceptible to suggestion and pathologically eager to please, he confessed to a crime he did not commit. The Seventh Circuit reversed because it was not confident that the district court had applied the *Daubert* framework. The court stated:

In proper circumstances, experts in psychiatry and psychology can meet both these hurdles: real science, and testimony based thereon.

*Id.* at 1343.

In *United States v. Shay*, 57 F.3d 126 (1st Cir.1995), the First Circuit reversed a district court's decision to exclude expert testimony on Munchausen's Disease, a mental disorder known formally as pseudologia fantastica which is characterized as an extreme form of pathological lying. The court found there was no reason to exclude expert testimony that bears on truthfulness where the defendant claimed that he suffered from a mental disorder that caused him to make grandiose statements similar to those the government was trying to use against him. The court, however, remanded to determine whether the expert's testimony "fit" the facts of the case and whether the prejudicial effect outweighed the probative value pursuant to Rule 403. *Id.* at 134. Finally, in *Shahzade v. Gregory*, 923 F.Supp. 286 (D.Mass.1996),

the court applied the *Daubert* analysis and held that testimony concerning repressed memory evidence was admissible. In upholding the admissibility of this testimony the court emphasized that the expert discussed "several detailed studies," *Shahzade*, 923 F.Supp. at 288, and that the majority of the clinical psychiatrists recognized the theory of repressed memories and did not find the theory itself controversial. Indeed, the expert had testified that this was not "a new craze among American psychiatrists . . . this is a very old issue in psychiatry." *Id.* (emphasis in original) Finally, the court found significant the fact that disassociated amnesia was included and discussed in the DSM–IV because this indicated that it had been recognized by the psychiatric community. *Id.* at 289–90.

Significantly, however, all the cases applying *Daubert* to psychiatry recognize that even if the expert testimony is admissible pursuant to Rule 702, it may be disallowed pursuant to Federal Rules of Evidence 402 and 403 if the evidence is irrelevant, misleading, wasteful, confusing, or its prejudicial effect substantially outweighs its probative value. As the Supreme Court recently observed, "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2798 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is sound. It should not be amended*, 138 F.R.D. 631, 632 (1991)). Also, in *Hall* the Seventh Circuit emphasized that conclusory statements without explanation by the expert can contribute to the jury's misunderstanding of the subject and are subject to exclusion. The court stated:

Even though experts are entitled to give their opinion on an ultimate issue in the case, see Rule 704(a), this does not mean that the opinion may be given divorced from the scientific, medical, or other ex-

pert basis that qualified the witness in the first place.[1]

*Hall,* 93 F.3d at 1344.

### Compulsive Gambling Disorder

Dr. Robert Hunter testified that he studied under Dr. Robert Custer who apparently first identified compulsive gambling as a mental disorder and not just antisocial behavior. Hunter has been studying the disease for many years and is considered a national expert. He testified that the disease has been identified in the DSM–III, DSM–III–R and DSM–IV, demonstrating that it has been officially recognized by those publications for sixteen years. Dr. Hunter has treated over a thousand in-patients and many more out-patients suffering from compulsive gambling disorder. He is clearly qualified to testify about the disorder.

Moreover, this Court found that the disorder generally met the *Daubert* test for validity based upon Dr. Hunter's testimony and its appearance in the Diagnostic and Statistical Manual for sixteen years. The Court, in making this decision, took account of the many cases which have excluded expert testimony of compulsive gambling disorder as a defense in criminal cases. *United States v. Sinigaglio,* 925 F.2d 339, 342 (9th Cir.1991) (expert testimony of compulsive gambling was properly excluded by the Ninth Circuit in defense of failure to file income tax returns); *United States v. Gould,* 741 F.2d 45 (4th Cir.1984); *United States v. Torniero,* 735 F.2d 725 (2d Cir.1984); *United States v. Lewellyn,* 723 F.2d 615 (8th Cir.1983); *United States v. Shorter,* 809 F.2d 54, 58 (D.C.Cir. 1987). These cases, however, focus on the nexus of the disorder with the specific crime. *See* discussion *infra* at pages 1195–1197 of this Opinion.

The Diagnostic and Statistical Manual of Mental Disorders is widely used by psychiatrists to define mental diagnostic categories and is published by the American Psychiatric Association. *See Shahzade,* 923 F.Supp. at 289–90. In the introduction to DSM–IV the revision process indicates an objective methodical procedure. It is stated:

> The task force on DSM–IV and its Work Groups conducted a three-stage empirical process that included (1) comprehensive and systematic reviews of the published literature, (2) reanalysis of already collected data sets, and (3) extensive issue-focused fields trials.

(DSM-IV at xviii.) The mental disorders are described in the DSM–IV as:

> A clinically significant behavioral or psychological syndrome or pattern that occurs in an individual and that is associated with present distress (e.g., a painful symptom) or disability (i.e., impairment in one or more important areas of functioning) or with a significantly increased risk of suffering death, pain, disability, or an important loss of freedom.

(DSM-IV at xxi.) With regard to the criteria for change, the process adopted in the DSM–IV conveys a reasoned and methodically approved process rather than an uncertain and inactive procedure.

It is stated:

> Although it was impossible to develop absolute and infallible criteria for when changes should be made, there were some principles that guided our efforts. The thresholds for making revisions in DSM–IV was set *higher* than for DSM–III and DSM–III–R. Decision had to be substantiated by explicit statements of rationale and by the systematic review of relevant empirical data.

(DSM-IV at XX) (emphasis added). The Manual also carefully provides various caveats concerning the definitions of mental disorders, because no definition "adequately specifies precise boundaries for the concept"

---

**1.** *See United States v. Marsh,* 26 F.3d 1496 (9th Cir.1994) where the Ninth Circuit did not apply *Daubert,* which had been decided shortly before the opinion was issued but held that the proffered expert testimony regarding the victim's mental capacity was too attenuated to be admissible. The defendant argued that because the victim had a dependent personality disorder the defendant could not be guilty of attempted extortion because the victim voluntarily gave the money to the defendant. The court found that the district court in the exercise of its discretion properly concluded that the expert evidence would not have been of assistance to the jury. *Id.* at 1503.

of the disorder. (DSM–IX at xxi.) Furthermore:

The concept of mental disorder, like many other concepts in medicine and science, lacks a consistent operational definition that covers all situations.

(DSM–IV at xxi.) The diagnostic features clarify the diagnostic criteria and often provide illustrative examples.

■ Relying on the methodology set forth in the DSM–IV and Dr. Hunter's expertise in connection with that methodology, the Court found that the compulsive gambling disorder in general met the *Daubert* scientific "validity" test and that Dr. Hunter would be allowed to testify based upon adequate foundation that the Defendant was a compulsive gambler at the time the alleged crimes occurred. The Court's decision, however, limited his testimony to the ten diagnostic criteria for pathological gambling set forth on page 618 of the DSM–IV.

### Distortions in Thinking/Denial

■ An associated feature of the compulsive gambling disorder is distortion in thinking and in particular denial. DSM–IV at 616. The Court excluded Dr. Hunter's expert testimony regarding this characteristic because it did not meet the *Daubert* scientific validity test, was irrelevant to the crimes charged, and pursuant to Rule 403, the prejudicial effect outweighed the probative value.[2]

### a. Lack of Scientific Validity

The Court precluded Dr. Hunter from testifying to distortion in thinking, e.g., denial based upon the DSM–IV's limitation on the scientific efficacy of an Associated Feature. The Manual states:

*Associated Descriptive Features and Mental Disorders,* This section includes clinical features that are frequently associated with a disorder *but that are not considered essential to making the diagnosis. In some cases, these features were considered for inclusion as possible diagnostic criteria but were insufficiently sensitive or specific to be included in the final criteria set,*

(DSM–IV at 616) (emphasis added). Concomitantly, the Court was influenced by the sincerity of Dr. Hunter's reservations regarding the lack of sufficient research of the compulsive gambling disorder in general. He readily admitted that though he had complete confidence in his diagnosis, there have been no studies on the potential rate of error for compulsive gambling in general. In particular he stated:

I don't know at what percentage of what— I couldn't tell you how many false gambling diagnoses are made.

(Rep.'s Tr. at 134.)[3] Generally, he stated that the scientific knowledge concerning pathological gambling was significantly behind other addictions and years behind the formal research generated. He referred to the study of pathological gambling as the "step child of addiction" and stated they were probably twenty years behind in formal research relative to other addictions. In particular, the diagnostic "stuff" and the actual presence and formal diagnostic manuals are more recent than other addictions. He recalled referring to the state of the knowledge on compulsive gambling as "[a]n eye blink in time in medical terms." (Rep.'s Tr. at 174–76.) He concluded by stating that "[t]he truth is much of what we know [about compulsive gambling] comes from the weight of prior training and knowledge, but the application of clinical experience. That's, frankly, why I'm disappointed." (Rep.'s Tr. at 177.) There are only ten clinicians in the country who have been studying this for more than a decade. (Rep.'s Tr. at 177.)

If the extent of the studies regarding the compulsive gambling disorder in general represents a blink of an eye, the studies regarding the distortion in thinking, that is denial, resemble the blink of an eyelash. Dr. Hunter said his testimony regarding the distortion in thinking was not that "gamblers are incap-

---

**2.** A district court's exclusion of expert testimony will not be reversed unless it amounts to manifest error. *United States v. Byers,* 730 F.2d 568, 571 (9th Cir.1984).

**3.** References are to the unofficial transcript of the Hunter hearing.

able of filling out income tax forms and it's ridiculous to think that you can bring scientific, known potential error rate to that theory, the theory subjected to peer review...." (Rep.'s Tr. at 153.) He was subpoenaed by the Government to bring scientific literature that would support his conclusion that the Defendant did not have the mental state to commit the alleged crimes. He stated that he did not bring anything scientifically to support the idea that pathological gamblers cannot truthfully report gambling income on an income tax form because that does not exist. (Rep.'s Tr. at 155–56.) Finally, he said that it was "ludicrous" to request him to bring supporting data that gamblers cannot fill out income tax returns and stated:

> [c]ause it's not my opinion that gamblers can't truthfully report. My opinion is that they frequently stay in denial and they frequently don't look at the black and white issues financially.

(Rep.'s Tr. at 156–57.) Although. he stated he believed that there was "some scientific evidence," basically, his opinion is that compulsive gambling is a legitimate condition. (Rep.'s Tr. at 158.) In particular he stated that there was a huge body of scientific evidence on the essential *nature* of the condition of compulsive gambling that, "[i]t's real, that it exists. There's still debate going on on how much is biology, how much is social learning, how much is past history, how much does comorbidity affect it. There's some—frankly, there's some fairly basic things that haven't been looked at hard enough. There's no studies on gambling in the elderly. There's few studies on gambling in youth. Is there study on gamblers and income taxes? No, there's not." (Rep.'s Tr. at 160.)

He stated that there was no published scientific literature which has given any measurement from a scientific standpoint of the ability of a pathological gambler to grasp the fact that they have won money gambling. (Rep.'s Tr. at 170.) He further explained that it was a commonly held belief but there was not a study or a book supporting it. (Rep.'s Tr. at 171.) He was aware of only one study in New Jersey but he could not recall the name. The study was completed in the 1970's and indicated that the gamblers thought they were even or slightly ahead when in fact they were losing money, but there have been no follow up studies or analysis.

The strongest support for the relevance of any testimony concerning thinking distortions or denial associated with pathological gambling was that it was "a generally accepted clinical idea." (Rep.'s Tr. at 179.) With respect to the Defendant and whether he was inflicted with this distortion in thinking, Dr. Hunter offered no scientific proof. He merely *"implied"* it as part of the condition. (Rep.'s Tr. at 197) (emphasis added).

■ Plainly, Dr. Hunter could not provide any scientific evidence of falsifiability or the error rate of the distortion in thinking or denial. The peer review and publication was minimal. The strongest support was the general clinical acceptance from a small group of clinicians. He offered no additional factors that might be considered to establish its scientific validity. Thus, the Defendant failed to establish the validity test required by *Daubert* for the thinking distortion/denial defense.

### b. *Relevance and the Prejudicial Effect versus the Probative Value Pursuant to Rules 402 and 403*

Counts two through six of the indictment charge the Defendant with willfully making false statements on his income tax returns. Counts one and two include charges for willfully failing to report forgiveness of debt income. Defendant claimed that his distortion in thinking and in particular "denial" diminished his capacity to willfully commit these crimes. After hours of testimony by Dr. Hunter, a rational connection between denial and failure to willfully commit the crime for making false statements on tax returns did not emerge. The most favorable explanation of a nexus was elicited in redirect examination of Dr. Hunter when he answered that, within the realm of psychological probability, the Defendant could have misevaluated his wins and losses and believed he was telling the truth. (Rep.'s Tr. at 257.) There was, however, no scientific support for this opinion, and Dr. Hunter's cumulative

testimony was inconsistent and confusing on this point.

Dr. Hunter vacillated in his description of this thinking distortion characterized as denial and its effect on the charges. As previously stated, he steadfastly said that it was not his opinion that gamblers could not truthfully report on their income tax returns. (Rep.'s Tr. at 156–57.) He stated that their memories were very selective but that "this is difficult to explain. There's some random stuff going on in there." (Rep.'s Tr. at 168.) He readily admitted that pathological gamblers were not in a trance or psychotic or delusional. (Rep.'s Tr. at 168.) He then stated that it was not that they could not remember:

> My opinion, if you're interested, is that they *do tend to think of it*—in the back of their mind they're still aware of the enormous losses. I mean, they do—that's [sic] people are not crazy, they're not stupid and if they've lost consistently over years they feel like they're making progress.

(Rep.'s Tr. at 171)(emphasis added). He described the thinking dysfunction as that "gambling is killing [him] but eventually it will save [him]." (Rep.'s Tr. at 196.)

Importantly, he did not state that compulsive gamblers had absolutely no memory of what occurred when they engaged in preparing their tax returns. Significantly, in explaining the thinking dysfunction criteria, he said he did not mean to imply that when the Defendant went to his accountant, he was unable to answer the questions truthfully. Dr. Hunter stated:

> I know for a fact that that's not the spirit of that, and I don't mean to be argumentative. I know when they wrote that criteria, I talked to the committee that wrote it, they certainly were not trying to capture that idea. I'm just suggesting that if you're preoccupied, there is some distortion in thinking because you're thinking about the next win. Might it impact a little? Yeah. But, no, I concede your point, I really do.

When asked by the Court whether the Defendant in meeting with his accountant would not know the truth or falsity of his wins and losses, Dr. Hunter stated:

No, I'm saying that it's very likely that he would not want to deal with that issue in any specific way, because that would shatter the denial mechanism. And that if he is like the majority of the patients I've treated. In that setting he would say, "No, I'm down. I've mortgaged my house. My wife is mad at me." You know, so on. "I'm losing. I don't have any winnings."

(Rep.'s Tr. at 210–11.) Thus, Dr. Hunter described the denial phenomenon as it is commonly understood: "a refusal to acknowledge the truth of a statement," not an inability to acknowledge it. *Webster's New Riverside University Dictionary* 1992.

Later in his testimony he retreated to some extent on whether the Defendant knew he was making a false statement on his returns.

> I think it is possible and conceivably likely that if you hooked him up to a polygraph that day and said, "[w]here are you in the grand scheme of things?" He would have said, "I'm not winning anything, no. I've no obligation to the federal government."

(Rep.'s Tr. at 114.) Again, however, when he was asked if the thinking impairment would preclude him from actually knowing if he had lost money at Las Vegas, he responded:

> No, I do not believe that he was made retarded by his gambling, nor that he was made psychotic by his gambling. But I believe it would have been in the context of general global fact that is: "No, I'm not winning money. I'm gonna, but I'm not right now."

(Rep.'s Tr. at 215–16.) Again, he also had the following colloquy with the Court:

THE COURT: Would it affect the compulsive gambler's ability to tell the truth?

A. Without a doubt. It would affect their ability—again, back do [sic] the priest and the poor box—because whatever's going on is secondary to what they're about to do.

Q. Okay.

A. What they're about to do.

Q. And would it affect the ability of a compulsive gambler to knowingly not tell the truth?

A. That has—not necessarily, but sometimes. Again, I'm not trying to be evasive.

Q. Is that because of denial?

A. Correct.

THE COURT: In other words [compulsive gamblers] *can know they're not telling the truth,* but they're forced into it because of denial?

A. If you will allow me one more antidote.

THE COURT: Answer that yes or no, and then *you can go ahead and explain it.*

A. *Yes,* but. Again, I'm sorry, but there's just, this is hard to pin down. This is a soft—it science but it's soft science.

(Rep.'s Tr. at 219–20.) He then related a story of a very bright compulsive gambler who stole a checkbook from his dentist and wrote tens of thousands of dollars of bad checks. Dr. Hunter stated that he would argue that was not a crime, that a bright person would commit. Whether Dr. Hunter believes it is a crime normally committed by a bright individual, however, is irrelevant to whether it was willfully committed under the law. (Rep.'s Tr. at 220.)

Dr. Hunter admitted that there was no scientific testing or evaluation to judge whether the Defendant had been truthful with him. (Rep.'s Tr. at 222–23.) Finally, when asked Dr. Hunter stated that the Defendant did "know, I guess he did" have the ability to cheat the government. (Rep.'s Tr. at 231.)

It is clear that Dr. Hunter did the best he could to explain this complex and obscure feature of thinking distortion/denial which sometimes exists in pathological gamblers. His opinion is not the product of exquisitely designed, highly controlled experimental work but whatever his theory it barely rises above mere speculation. His expert testimony would not be helpful to the jury because there is no "fit" between his testimony and the issue of willfulness in this case. *Daubert,* 509 U.S. at 591, 113 S.Ct. at 2795–96. Therefore, pursuant to Rule 402, the Court finds his opinion on denial is not relevant and pursuant to Rule 403, it is confusing, inconsistent and will mislead the jury.

Accordingly,

The Court ruled that the Government's Motion in Limine to Preclude the compulsive Gambling Disorder was granted and denied in part. The Court granted the exclusion of any testimony concerning the associated feature of distortions in thinking, in particular, denial, but stated it would allow expert testimony concerning whether the Defendant suffered from pathological gambling during the time when the crimes occurred if the Defendant offered the defense of compulsive gambling and it had some nexus to the violations charged.