IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 16, 2008

Charles R. Fulbruge III
Clerk

No. 06-31234

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

TIMOTHY BLAKE DIXON

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana, New Orleans
USDC No. 2:05-CR-120-ALL

Before KING, BARKSDALE, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Defendant-appellant Timothy Blake Dixon appeals the district court's judgment finding him guilty of willfully and maliciously conveying false information in violation of 18 U.S.C. § 35(b) and sentencing him to thirty months of imprisonment. For the following reasons, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On July 12, 2004, a clear plastic bag containing a white crystalline substance was found sitting on a counter in the middle of the United States Post

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Office in Meraux, Louisiana. Written on the bag was the message: "Anthrax Die Americans." Later analysis revealed that the bag contained sugar.

Lieutenants Gina Holland and Les Raybon, of the St. Bernard Sheriff's Office, were assigned to the Federal Bureau of Investigation Joint Terrorism Task Force ("JTTF") and charged with investigating the hoax. Several months into the investigation, the officers received a tip that the defendant, Timothy Blake Dixon, might be responsible. Dixon was eighteen years old and living with his mother, Cheryl Michel Schleusner, near the Post Office at the time of the incident.

Based on the tip, the officers went to his mother's new home in Holden, Louisiana, where Dixon also resided. They spoke with his mother, who informed them that Dixon was out of the state. The officers would not tell her why they wanted to speak to Dixon. Still, she agreed to contact the officers when he returned and to allow them to interview him at her home.

Accordingly, on January 11, 2005, after hearing from Dixon's mother, Lieutenants Holland and Raybon went to the Dixon's residence and knocked on the front door. Dixon's mother met them at the entrance and admitted them. The officers told her they needed to speak to Dixon alone. The officers met Dixon, told him the purpose of their visit, and proceeded to question him in his living room. Initially, Dixon denied any involvement. However, when the officers told him that the bag had been sent for fingerprint analysis, without revealing that the results had already come back as inconclusive, Dixon admitted he was responsible.

Dixon testified that in addition to this ruse, the officers repeatedly threatened him until he finally "got tired of fighting" and falsely admitted his guilt. Lieutenant Raybon denied making any threats. Either way, the officers arrested Dixon, advised him of his Miranda rights, and drove him to the New Orleans FBI office. There, after Special Agent ("SA") Scott Allee read Dixon his

Miranda rights, Dixon signed a waiver of his rights and agreed to make a statement to SA Allee and Postal Inspector Charles Wagner. While he maintained, at first, that he only intended to use the bag to scare a fellow student at school, Dixon eventually confessed to deliberately leaving the bag at the Post Office.

On April 8, 2005, a grand jury indicted Dixon for one count of violating 18 U.S.C. § 35(b), which makes it a crime to willfully and maliciously, or with reckless disregard for the safety of human life, convey false information concerning an attempt to violate, inter alia, section 33(a). Section 33(a) prohibits a person from placing destructive substances in facilities supporting interstate commerce. See 18 U.S.C. § 33(a).

Before the trial, on July 19, 2006, the district court held a hearing on Dixon's motion to suppress his confessions. Dixon and his mother testified that Dixon was coerced into confessing. Dixon has a history of mental health problems, including gender issues, which he claimed the officers exploited by threatening him with sexual depredations in jail. Dixon also testified that he told Lieutenants Holland and Raybon to leave his home, after insulting them, but the officers refused to leave. Lieutenant Raybon directly contradicted these claims. He testified that: (1) Dixon never asked either him or Lieutenant Holland to leave; (2) he and Lieutenant Holland read Dixon his Miranda rights before questioning Dixon, even though Dixon was not under arrest; (3) Dixon agreed to be interviewed; and (4) while Dixon was evasive, he was "well-mannered" throughout the interview. On January 20, 2006, the court denied the motion to suppress.

During the trial, Dixon contended that he falsely confessed and sought to introduce expert testimony regarding false confessions. On August 22, 2006, the district court sequestered the jury and held a Daubert hearing to assess a challenge to Dixon's expert, Dr. Gregory DeClue. Dr. DeClue had not examined

Dixon and was not prepared to opine on whether Dixon's confessions were false. He intended only to testify generally concerning the phenomenon of false confessions. The district court excluded the proffered testimony because: (1) it did not meet the requirements of Federal Rule of Evidence 702; (2) it would have invaded the jury's duty to weigh the testimony; and (3) it was not applied to Dixon.

On August 23, 2006, after a prosecution built mostly around the confessions, the jury found Dixon guilty. On November 9, 2006, the district court held a sentencing hearing. There, the district court overruled Dixon's objection to the imposition of a sentencing enhancement for obstruction of justice because "reasonable jurors could have concluded that Mr. Dixon lied under oath when he testified here at this trial." In addition, the district court denied Dixon's motion for a non-guideline sentence. The district court reasoned, in part, that because "of his serious behavioral issues and because of . . . [his] morbid attraction to a period of world history that is at best disgusting, Nazism, . . . Dixon need[ed] a more structured environment than urged . . . by [defense counsel]." Accordingly, the district court sentenced Dixon, within the guideline range, to thirty months of imprisonment.

On November 20, 2006, Dixon filed a timely notice of appeal.

## II. DISCUSSION

A.     Whether the District Court Properly Denied Dixon's Motion to Suppress his Confessions

Dixon argues that his two confessions should have been suppressed as the fruit of an illegal police presence in his home. Dixon contends that the officers' failure to leave when allegedly requested violated his Fourth Amendment rights under Georgia v. Randolph, 547 U.S. 103, 122–23 (2005), and consequently, that his confessions are tainted. In addition, Dixon argues that the district court's fact findings in its order denying the motion to suppress were clearly erroneous

because of an internal inconsistency, namely, crediting Dixon's testimony that he was "nasty" to the officers, while rejecting his claim that he directed the officers to leave his house.

On an appeal of the denial of a motion to suppress, a district court's findings of fact are reviewed for clear error. United States v. Washington, 340 F.3d 222, 226 (5th Cir. 2003). Conclusions of law are reviewed de novo. Id. A "finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemmer City, 470 U.S. 564, 573 (1985). Moreover, "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." Id. at 575.

Here, in an answer to a single question, Dixon claimed that he told the deputies to leave his home and "compared them to some lowest level of form."[1] Dixon avers that the district court rejected the first part of the statement but credited the second part, even though both assertions were contradicted by

---

[1] Dixon's testimony:

[Question:] You said you got a little smart with them. I need you to tell the Court what the exchange was between you and the agents. What, if anything, did you say to them about them being in the house?

[Dixon:] Well, I told the guy that I didn't want him in my house and, personally they were not welcome in my house. I compared them to some lowest level of form, human being.

Lieutenant Raybon.[2] Dixon contends that the claim that he told the officers to leave is a concomitant part of the claim that he called them low-lifes, and therefore, the court clearly erred in separating them.

The district court's acceptance of one line of Dixon's testimony while rejecting the majority of it does not create an internal inconsistency that would constitute clear error. Lieutenant Raybon's version of the interview, averring that he and Lieutenant Holland were not directed to get out of Dixon's residence, was more coherent and plausible than Dixon's and his mother's testimony,[3] and also not contradicted by extrinsic evidence or the testimony of an impartial witness.

---

[2] Lieutenant Raybon's testimony:

[Question:] You don't recall him ever telling you during the time you were there in his home that he wanted you to leave, emphatically telling you, "Get out of my house"?

[Raybon:] He didn't say anything along those lines, nor did he allude to that.

[Question:] Okay. You don't recall him using any expletives to tell you to get out of his house?

[Raybon:] No. He was well-mannered and respectful.

[3] Dixon's testimony often contradicted his mother's. For example, at the motion to suppress hearing, Dixon's mother stated that she was directed to go outside by the lieutenants, and that Lieutenant Holland remained outside with her, while Dixon testified that his mother went outside to make a phone call, implying she did so on her own accord, and never mentioned that Lieutenant Holland left the interview. Dixon's mother also testified that when the lieutenants came she had to call her son to the door, whereas Dixon stated that he was already at the door directing her to not allow them inside. Also, the district judge specifically asked Dixon's mother her whereabouts during the entire interview, and her response included the living room, kitchen, and outside, but left out Dixon's claim that she went to his room to turn down music on Lieutenant Raybon's request.

Additionally, Dixon's testimony was internally contradictory. Dixon testified that the lieutenants threatened him and made him immediately defensive, but then, in response to what he thought about the FBI, he stated that "[p]ersonally, when they came over, [he] thought they were somewhat nice, and after [he] talked to them [he] wish[ed] [he] would have been a little nicer to them."

6

Moreover, Dixon misstates the district court's finding in its order denying the motion to suppress. The district court did not explicitly accept as true that Dixon "compared [the lieutenants] to some lowest level of form, human being"; rather, the court found that Dixon "felt they were low-life." This finding was more about the interview being contentious because Dixon was "nasty" to the lieutenants. In light of the record from the motion to suppress hearing, this finding of contentiousness is supported by Lieutenant Raybon's testimony that Dixon was initially evasive during the interview and Dixon's own sullen demeanor at the hearing.

In sum, based on all the evidence, we cannot say that a mistake has been committed by the district court. Consequently, we conclude that it was not clear error to credit Lieutenant Raybon's claim that Dixon did not request them to leave. See Anderson, 470 U.S. at 573 ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge [ ] the credibility of the witnesses.").

Since the district court found, and we uphold, that the officers were not asked to leave, there is no support for Dixon's argument that the failure to leave when requested violated his Fourth Amendment rights under Randolph. Thus, we will not opine on Randolph's reach, and we conclude that the district court's denial of Dixon's motion to suppress the two confessions was proper.

B.      Whether the District Court Properly Excluded Dixon's Expert's Testimony

Dixon argues that the district court abused its discretion by excluding Dr. DeClue's testimony. He asserts that: (1) the testimony would have been helpful to the jury because other witnesses established that the techniques that lead to false confessions were used in this case; (2) Dr. DeClue would not have invaded the province of the jury because his testimony was limited to the factors associated with false confessions; (3) exclusion of the evidence violated his due process and Sixth Amendment rights because it was a disproportionate remedy

when compared to the purpose of Rule 702; and (4) exclusion of the evidence was not harmless because his confession was central to the prosecution's case, and Dr. DeClue's testimony was a necessary safeguard against the "zeal of the agencies of prosecution." See Opper v. United States, 348 U.S. 84, 89 (1954).

We review a district court's exclusion of expert testimony for abuse of discretion. United States v. Ogle, 328 F.3d 182, 188 (5th Cir. 2003). If we determine that the district court abused its discretion, we must consider whether the error was harmless. United States v. Tucker, 345 F.3d 320, 326 (5th Cir. 2003).

At the Daubert hearing, Dr. DeClue stated that he would testify that: "people do make false confessions; [ ] there is some scientific knowledge about conditions that can contribute to false confessions; [ ] there are techniques that can be used to avoid false confessions; and [ ] there are techniques that can be used to recognize false confessions when they do occur." Dr. DeClue also stated that if he were asked whether Dixon had given a false confession, "there would be scientific hurdles with how accurate [he] could [ ] be with that, but that's not what [he is] going to do." Dr. DeClue never evaluated whether Dixon had given a false confession, nor did he analyze the interrogation techniques used on Dixon. The district court made an oral ruling excluding Dr. DeClue's proffered testimony, concluding that "Dr. DeClue would ask the jury to apply a science in the abstract only, . . . [with] too remote a connection between his testimony and the facts of this case . . . ."

Pursuant to Rule 702, testimony from a qualified expert witness is permitted if the opinion will assist the trier of fact, "the testimony is based upon sufficient facts or data, [ ] the testimony is the product of reliable principles and methods, and [ ] the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702 (emphasis added). Here, the district court determined that Dr. DeClue added nothing more than abstract scientific

nostrums. Dr. DeClue's proffered testimony did not apply recognized or accepted principles to Dixon's particular circumstances. Instead, it offered only the general proposition that false confessions can occur. See United States v. Alexander, 816 F.2d 164, 169 (5th Cir. 1987) (stressing that trial court's are not required to admit generic expert testimony). Accordingly, even if the district court could have properly admitted the evidence, it was not "manifestly erroneous" to exclude it.[4] See Tucker, 345 F.3d at 327–28 (5th Cir. 2003) (holding that even if improper, the district court's exclusion was not manifestly erroneous).

Moreover, Dixon's claim that the district court's application of Rule 702 violates his constitutional rights because its remedy is disproportionate to its purposes is meritless. As the Supreme Court noted, "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by [ ] other factors . . . ." Holmes v. South Carolina, 547 U.S. 319, 326 (2006) (citations omitted). Referring to evidentiary rules of this type, "[the Court] stated that the Constitution permits judges to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues." Id. at 326–27 (emphasis added and internal quotations omitted); see also United States v. Scheffer, 523 U.S. 303, 309 (1998) (upholding a rule excluding all polygraph evidence).

---

[4] Dixon also relies on two circuit court cases to support his argument, United States v. Hall, 93 F.3d 1337 (7th Cir. 1996) and United States v. Shay, 57 F.3d 126 (1st Cir. 1995), neither of which requires reversal of the district court. In both cases, the experts were prepared to provide specific testimony to the effect that the respective defendants' mental disorders made them more likely to falsely confess. See Hall, 93 F.3d at 1341 (experts would have testified regarding the defendant's propensity to falsely confess due to a personality disorder); Shay, 57 F.3d at 133 (expert would have testified that the defendant had a mental disorder that made him a pathological liar and caused him to make self-aggrandizing confession). In those cases, the expert testimony offered more than just abstract notions, because in addition to showing how to recognize false confessions, it suggested "how to decide whether it fit the facts of the case being tried." Hall, 93 F.3d at 1345.

C.     Whether the Evidence Corroborating Dixon's Confessions Sufficiently Supports the Jury's Verdict

At the end of trial, Dixon moved for a judgment of acquittal, which the district court denied.  On appeal, Dixon argues that there was no evidence corroborating his confessions and, therefore, insufficient evidence to support the jury's verdict.[5]

We review the denial of a defendant's motion for acquittal de novo.  United States v. Medina, 161 F.3d 867, 872 (5th Cir. 1998).  When reviewing the sufficiency of the evidence in a jury trial, we must determine whether a rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the defendant guilty beyond a reasonable doubt.  United States v. Norman, 415 F.3d 466, 470 (5th Cir. 2005).  Specifically, here we must decide whether a rational trier of fact could have reasonably found Dixon guilty based on his confessions and the evidence corroborating those confessions.

A defendant may not be convicted solely on the basis of an uncorroborated confession.  United States v. Deville, 278 F.3d 500, 506 (5th Cir. 2002).  However, the government is not required to introduce corroborative evidence that is sufficient, independent of any confession, to establish the corpus delicti.  Opper v. United States, 348 U.S. at 93.  Rather, the government must introduce independent evidence establishing the trustworthiness of the confession.  Id.; see Smith v. United States, 348 U.S. 147, 156 (1954) ("[O]ne available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused.").

---

[5] Dixon did not object at trial that his confessions should not be admitted due to the government's lack of corroborating evidence.  However, because he only questions the sufficiency of the evidence on appeal, and not whether the district court erred in admitting his confessions, Dixon's failure to object is of no consequence.

First, even without considering Dixon's confessions, the independent evidence revealed that a crime had been committed. Testimony provided that a plastic bag with a white crystalline substance was found on a counter in the Meraux Post Office with the inscription "Anthrax Die Americans" written in black marker. The chemical analysis later provided that the substance was in fact sugar, not anthrax. Thus, sufficient evidence was presented to the jury that someone conveyed false information concerning the placement of destructive substances in a facility supporting interstate commerce. See 18 U.S.C. §§ 35(b), 33(a); see also Caster v. United States, 319 F.2d 850, 852 (5th Cir. 1963) ("To prove the corpus delicti of an offense, by evidence independent of the confession, the [g]overnment need only prove that the offense in question likely has been committed.") (emphasis added); Vogt v. United States, 156 F.2d 308, 311 (5th Cir. 1946) ("The[] confessions by the Defendants were admissible provided there was also in evidence such extrinsic corroborating facts and circumstances as would justify a jury in finding that the alleged crime had been committed by someone.") (emphasis added).

Additionally, our confession jurisprudence requires that "[t]he evidence corroborating a confession must tend to connect the accused with the crime." United States v. Abigando, 439 F.2d 827, 832 (1971); but see United States v. Wilson, 529 F.2d 913, 915 (10th Cir. 1976) (stating that a defendant's confession alone may establish that he is the one who perpetrated the crime and that independent evidence need only establish the trustworthiness of the confession). In this case, Dixon confessed, not once but twice, to the same facts that established a crime had been committed, namely, leaving a plastic bag of sugar on the counter at the Meraux Post Office on the morning of July 12, 2004, with the inscription "Anthrax Die Americans" written on the outside of the bag. As Dixon contends, he could have learned this information from news reports; however, the government also presented extrinsic evidence of Dixon's past use

of the phrase "Die Americans," further corroborating his confession.[6]  Based on his prior use of this phrase and his two confessions delineating the facts constituting the crime, a rational juror could reasonably infer that Dixon was the someone who wrote the phrase on the bag of sugar and left it at the Meraux Post Office.  See United States v. Blake, 941 F.2d 334, 338–39 (5th Cir. 1991), abrogated on other grounds by United States v. Tolliver, 116 F.3d 120, 124 (5th Cir. 1997), (holding that evidence of past drug trafficking could corroborate a later drug trafficking confession).

Accordingly, we hold that his confession was sufficiently corroborated.

D.     Whether the District Court Improperly Applied the Obstruction of Justice Sentencing Enhancement

Dixon argues that the district court erred when it sentenced him by using the wrong evidentiary standard in its fact findings supporting the obstruction of justice enhancement.  Specifically, the district court determined that a reasonable jury could have found perjury on the evidence presented, when it should have made its own finding, apart from the jury's verdict, using a preponderance of the evidence standard.

In the instant case, when Dixon objected to the obstruction of justice enhancement in the Pre-Sentencing Report (the "PSR"), the district court was required to make fact findings on the record supporting the enhancement.  See United States v. Dunnigan, 507 U.S. 87, 95 (1993) ("[I]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition [ ] set out.").  District court findings must be made by a preponderance of the evidence.  United States v. Mares, 402 F.3d 511, 519

---

[6] Nova Academy's school counselor testified that at the time Dixon attended that school, he confessed to using sidewalk chalk to draw swastikas and write the phrase "Die Americans."

(5th Cir. 2005). "Simply basing the enhancement on the jury's verdict is improper." United States v. Ricardo, 472 F.3d 277, 285 (5th Cir. 2006).

Here, the district judge overruled Dixon's objection to the enhancement stating:

> I presided at the trial. I heard all of the testimony as did the jury. Mr. Dixon was convicted by the jury in part based upon his own testimony, which the jury wholly rejected. And it seems to the Court that reasonable jurors could have concluded that Mr. Dixon lied when he testified under oath. So the objection to the presentence report regarding the obstruction of justice enhancement is denied.

R. 348–49 (emphasis added). However, Dixon did not object to the reasonable juror standard that the district court applied during sentencing. Consequently, on appeal, we review for plain error. To prevail, Dixon has the burden of establishing: (1) an error; (2) that is clear and obvious; and (3) that affected his substantial rights. United States v. Hernandez-Martinez, 485 F.3d 270, 273 (5th Cir. 2007) (citing United States v. Olano, 507 U.S. 725, 732–34 (1993)). "If these conditions are met, this court can exercise its discretion to notice the forfeited error only if 'the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" Id. (quoting Olano, 507 U.S. at 732).

In this case, we conclude that even though the district court committed plain error when it based its conclusion on what a reasonable juror could have found in lieu of making its own findings, this error did not affect Dixon's substantial rights. In most cases the affecting of substantial rights requires that the error be prejudicial; it must affect the outcome of the proceeding. Crawford v. Falcon Drilling Co., 131 F.3d 1120, 1125 (citing Olano, 507 U.S. at 734–35). Here, because the district court also adopted the PSR findings, as Dixon conceded at oral argument, and those findings were adequate to support the obstruction of justice enhancement based on perjury, Dixon was not prejudiced

13

by the application of the reasonable juror standard at sentencing. See United States v. Rickett, 89 F.3d 224, 226 (5th Cir. 1996) (stating that the district court, in complying with its duty to make fact findings in support of an obstruction of justice enhancement, may accept the facts set forth in the PSR, even when those facts are disputed).

Although "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding," it is sufficient if "the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury." Dunnigan, 507 U.S. at 95. Perjury is defined as a witness testifying under oath or affirmation who gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory. United States v. Cabral-Castillo, 35 F.3d 182, 187 (5th Cir. 1994) (citation omitted). "A matter is 'material' if it is 'designed to substantially affect the outcome of the case.'" Id.

The PSR findings include that: (1) Dixon was identified as a suspect in the anthrax threat and admitted to JTTF agents that he committed the offense; (2) Dixon confessed a second time to SA Allee, further stating that he did it to feel important, he had been "feeling like dirt, . . . someone had to pay, and [he] wanted to have some fun and scare some people"; (3) Dixon testified at trial, however, that he did not commit the offense and that his confessions were false and coerced; and (4) his testimony constituted perjury.[7] Based on these adopted facts, the district court found, at least implicitly, that Dixon's testimony at trial was false as to a material matter—whether he committed the subject crime—and did not result from confusion, mistake or faulty memory, but a

---

[7] The relevant findings in the PSR are in two separate places in the PSR, and in one (but not both) of those places, there is a separate finding (included as a predicate for a finding of perjury) that the jury found Dixon guilty.

willful attempt to change his story. See id. (upholding an obstruction of justice enhancement based on the trial judge's implicit finding that the defendant falsely accused an agent of having obtained his confession by coercive tactics).

In sum, because Dixon did not establish that the plain error the district court committed by relying on the jury's finding affected his substantial rights, we uphold the obstruction of justice sentence enhancement.[8]

E.     Whether the District Court Improperly Considered Dixon's Nazi Sympathies in Selecting a Sentence

Dixon argues that the district court improperly considered his fascination and belief in Nazism when imposing its sentence. Dixon did not specifically object to the district court's ruling at the sentencing hearing, so we review for plain error. See Hernandez-Martinez, 485 F.3d at 272–73 (5th Cir. 2007) (applying plain error review because the defendant did not notify the district court that it considered an improper factor). We will not set aside the sentence unless there is: (1) an error; (2) that is plain and obvious; and (3) that affected his substantial rights. Id. at 273.

In Dawson v. Delaware, 503 U.S. 159, 165 (1992), the Supreme Court held that it was unconstitutional to consider the defendant's membership in a racist gang as an aggravating factor for consideration in sentencing. The Court reasoned that the defendant's membership had no relevance to the crime, which was not racially motivated, nor was his conduct connected to the beliefs of the

---

[8] In United States v. Johnson, the district court overruled the defendant's objection to the imposition of an obstruction of justice enhancement because it had heard the allegedly suborned perjury and believed it was a lie. 352 F.3d 146, 147–49 (5th Cir. 2003). The defendant did not object to the adequacy of the district court's findings. Id. at 149. Nevertheless, we refrained from imposing plain error review "[b]ecause [the defendant did] not complain on appeal about the specificity of the district court's findings and because the district court's findings [were] not adequate." Id. at 150 n.2 . In this case, Dixon similarly did not complain about the specificity of the district court's findings on appeal, however, as conceded by him at oral argument, the district judge adopted the PSR findings, and those findings are adequate to support the enhancement, thus, effectively distinguishing Johnson.

gang. Id. at 165–166. The Court recognized, however, that it is appropriate to consider a defendant's beliefs during sentencing when considering whether the defendant is likely to engage in similar criminal conduct in the future. Id.; see, e.g., United States v. Simkanin, 420 F.3d 397, 417–18 (5th Cir. 2005) (determining that the district court properly considered the defendant's association with a group that endorses the view that free persons are not required to pay income taxes during a sentencing hearing for tax fraud); Fuller v. Johnson, 114 F.3d 491, 497–98 (5th Cir. 1997) (holding that the defendant's membership in a racist gang was properly considered at sentencing because the gang's violent tendencies tended to show the defendant's potential for future dangerousness).

In this case, the district court was mainly concerned with Dixon's potential recidivism during sentencing.[9] Dixon had previously demonstrated anti-social behavior that incorporated the use of Nazi symbols. Dixon himself claimed that he had mental health problems, allegedly stemming from the environment in which he was reared. In this context, it is understandable that the district court did not want to return Dixon to that environment. Moreover, the sentencing was within the guidelines and is presumptively reasonable. See Rita v. United States, 127 S. Ct. 2456, 2463–67 (2007). Consequently, the district court did not commit plain error.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment.

---

[9] The district court found that the guidelines were correctly calculated due to the seriousness of the offense and the need for deterrence. The court also considered Dixon's past conduct. While Dixon may have been "more youthful and even more stupid than he is now . . . the fact is he [previously committed similar acts]. [The court] could not [say] that [Dixon would] not do it again as long as [the court had] supervision over his conduct." Although the district court agreed that Dixon had mental health problems and a difficult upbringing, those mitigating factors were reflected in a sentence well below the five-year statutory maximum.