UNITED STATES of America

v.

Michael JACQUES.

No. 09–cr–30001–MAP.

United States District Court, D. Massachusetts.

May 17, 2011.

Kevin O'Regan, Paul H. Smyth, Nicole Lee Ndumele, United States Attorney's Office, Springfield, MA, Erin Aslan, U.S. Department of Justice, Criminal Section, Washington, DC, for United States of America.

Lori H. Levinson, Great Barrington, MA, for Michael Jacques.

## *MEMORANDUM AND ORDER REGARDING PROFFERED EXPERT TESTIMONY*

PONSOR, District Judge.

### I. *BACKGROUND*

In the hours following Barack Obama's election, between November 4 and November 5, 2008, the Macedonia Church of God in Christ in Springfield, Massachusetts, was destroyed by a fire that was quickly identified as arson. The congregation of the church was largely African–American.

Some weeks later, after having made inculpatory statements to a state trooper working undercover, Defendant was arrested and, following a waiver of his *Miranda* rights, agreed to speak to law enforcement officers. After several hours of questioning, all recorded on videotape, Defendant confessed to participating in the arson. While he denied any racist motivation on his own part, he conceded, in essence, that the two other men involved with him committed the crime as an expression of racial bias against the black congregation and as an act of protest against the election of President Obama.

Following his indictment, Defendant moved, through counsel, to suppress his confession on various grounds. On February 18, 2011, after a lengthy evidentiary hearing, this court orally denied Defendant's motion. Recently, the court followed up with a written memorandum setting forth the reasons for this ruling in detail. (*See* Dkt. No. 297.)

Defendant's counsel thereafter made a proffer of expert testimony regarding false confessions, which she wished to offer at trial, and the government objected. On March 2, 2011, the court conducted a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), concerning this potential testimony. The putative expert, Professor Alan Hirsch, laid out the evidence he intended to offer regarding the existence of false confessions generally, as well as certain features of the specific interrogation that, in his view, increased the risk of a false confession.

This court ultimately declined to permit Professor Hirsch's testimony, but addressed the issue of false confessions both in its *voir dire* questions during jury selection and in its jury instructions. On April 14, 2011, after seventeen days of trial, at which the confession was presented, a jury found Defendant guilty of conspiracy against civil rights in violation of 18 U.S.C. § 241, damage or destruction to religious real property in violation of 18 U.S.C. § 247(c), and use of fire to commit a felony in violation of 18 U.S.C. § 844(h)(1).[1]

---

1. At the trial, a co-defendant, Thomas Gleason, testified for the government and identified Defendant as one of the arsonists.

This memorandum will set forth the court's reasons for declining to permit the expert testimony proffered by Defendant regarding false confessions.

## II. *DISCUSSION*

 Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal courts. Rule 702 mandates that an expert be "qualified ... by knowledge, skill, experience, training, or education" and that the expert possess specialized knowledge that "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. In addition, the rule requires that such testimony (1) rest on "sufficient facts or data," (2) reflect the use of "reliable principles and methods," and (3) involve the reliable application of those principles and methods to the facts of the case. *Id.* In examining these elements, the trial court plays an important role as gatekeeper of evidence presented to the jury. *See Daubert,* 509 U.S. at 589, 113 S.Ct. 2786; *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (extending *Daubert's* gatekeeping function beyond scientific testimony to all expert testimony). When screening potential testimony, the trial court may consider factors such as whether the proposed evidence can be tested, whether it has been subjected to peer review and publication, whether a theory or technique exhibits a known or potential rate of error, and whether it is in fact generally accepted. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786.

This court excluded Professor Hirsch's testimony on two principal grounds: (1) he lacked specialized knowledge that would assist the jury in understanding or weighing the evidence; and (2) his testimony was not based on sufficient facts or data and did not involve the application of reliable principles or methods to the facts of this case.

## A. *Professor Hirsch's Expertise.*

As noted, Rule 702 requires that the witness be "qualified as an expert by knowledge, skill, experience, training, or education," and that he be prepared to offer scientific, technical, or other specialized knowledge that will assist the trier of fact in understanding or weighing the evidence. Fed.R.Evid. 702. Here, the proposed expert, Professor Alan Hirsch, is a graduate of Amherst College and Yale Law School, presently employed as an unaffiliated attorney and as a part-time visiting professor at Williams College in the Political Science Department and Legal Studies Program. Professor Hirsch's expert declaration reveals that he has a particular interest in the literature of false confessions and asserts that he has "contributed substantially" to that literature. (Dkt. No. 239, Hirsch Decl. ¶ II.) At the hearing on March 2, 2011, Professor Hirsch described these contributions.

Professor Hirsch has authored three scholarly articles relating to the field of false confessions: *Confessions and Harmless Error: A New Argument for the Old Approach,* 12 Boalt J. Crim. L. 1 (2007); *Threats, Promises, and False Confessions: Lessons of Slavery,* 49 How. L.J. 31 (2005); and *The Tragedy of False Confessions (and a Modest Proposal),* 81 N.D. L.Rev. 343 (2005). Respectively, these articles present (1) an argument against the Supreme Court's holding in *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), which determined that a trial court's wrongful admission of a confession was subject to harmless-error review; (2) a comparison of false confessions made by modern criminal defendants to those made by slaves in nineteenth-century America, and an argument for the *per se* inadmissibility of confessions induced by threats or promises; and (3) a book review of *An Expendable Man* by

Margaret Edds, including a proposal to require the automatic transfer of cases to a different prosecutor's office upon the discovery of exonerating DNA evidence. The first two articles are each twenty-seven pages long, and the book review comprises eight pages.

While these articles contribute somewhat to the literature on false confessions generally, they do not address a single issue having direct relevance to this proceeding. They do not present new findings on the prevalence of false confessions; they do not identify specific factors shown to increase or decrease the reliability of confessions; and, of most relevance here, they do not critique particular law enforcement interrogation techniques.

Professor Hirsch has never personally conducted any original studies in the area of false confessions. He has never participated in an interrogation, never (so far as the record indicates) even been present at an interrogation, never (again, so far as the record shows) directly interviewed anyone who has been interrogated, and never personally interviewed any group of interrogators who have used particular techniques. He has no psychological training, or any training in statistical or sociological analysis. Although the work is interesting, it can hardly be argued that authoring three articles very loosely related to the field of false confessions renders Professor Hirsch an expert for *Daubert* purposes in this trial.

Apart from these scholarly articles, and his reading of the notable literature in the field, Professor Hirsch has written two short op-ed pieces, one for the *Legal Times* in 2008 [2] and one for the *Los Angeles Times* in 2006,[3] and also operates a website, www.truthaboutfalseconfessions.

com, which is devoted to the subject of false confessions.

Although these efforts further illustrate that Professor Hirsch has a genuine interest and academic credentials in this area, his degree of specialized knowledge is simply too thin to give his testimony the foundation needed to permit a jury to consider it. In the end, he is simply an intelligent man, well read in the area, who has written a bit on the general topic of false confessions and who holds an opinion on the topic. That is not enough.

### B. *Methodology.*

Professor Hirsch was prepared to testify that (1) contrary to popular belief, people do confess to crimes they have not committed; (2) certain police interrogation techniques carry a risk of obtaining false confessions; and (3) such techniques were used in this case, thus rendering Defendant's confession unreliable.

The court will address these three proposed areas of testimony in reverse order, starting with the most problematic.

#### 1. *"The Defendant's Confession Was Unreliable".*

In his declaration, Professor Hirsch observed that false confessions fall into several categories and that the relevant category here is the "coerced-compliant" confession, which is produced by "a suspect who knows he is innocent but nevertheless confesses in order to escape a difficult interrogation or to gain an implied benefit." (Dkt. No. 239, Hirsch Decl. ¶ VII.) Professor Hirsch proposed to testify that coerced-compliant false confessions have certain characteristics, that Defendant's confession shared those characteristics, and that, therefore, he had

---

**2.** Alan Hirsch, *Not Coming Clean: Common Police Practices Won' Cure Tainted Terrorist Confessions,* Legal Times (Feb. 18, 2008).

**3.** Alan Hirsch, *Why the Innocent Confess,* The Los Angeles Times (Apr. 25, 2006).

"substantial basis for concern about the reliability of the defendant's confession." (*Id.* ¶ XX.) Although Professor Hirsch offered reassurance that he would not directly opine on Defendant's guilt or innocence, (Dkt. No. 262, Tr. 2/3/11, at 85), his proposed testimony amounted to just that.

■ It is well established, and obvious, that an "expert" cannot offer an opinion as to guilt or innocence at a criminal trial. *See, e.g., United States v. Boney*, 977 F.2d 624, 630 (D.C.Cir.1992) ("An expert may not testify on the ultimate question of guilt or innocence...."); *United States v. Lockett*, 919 F.2d 585, 590 (9th Cir.1990) ("A witness is not permitted to give a direct opinion about the defendant's guilt or innocence."); *United States v. Masson*, 582 F.2d 961, 964 n. 5 (5th Cir.1978) (holding that trial judge correctly refused to permit defendant's attorney to ask witness whether he believed the defendant was guilty).

■ Professor Hirsch's proposed testimony would have run directly contrary to this well-established rule. An opinion that a defendant's statement "I am guilty" is unreliable cannot be logically disconnected from the implicit opinion that the defendant is, in fact, *not* guilty. *See United States v. Benally*, 541 F.3d 990, 995 (10th Cir.2008) ("While [the defendant] emphasizes that Dr. Davis would not have opined as to whether she believed [the defendant] confessed falsely, with or without the opinion, the import of her expert testimony would be the same: disregard the confession and credit the defendant's testimony that his confession was a lie."). At any rate, if there is a distinction to be drawn between the two propositions, it may be suitable for discussion in a philosophy seminar, not at a jury trial.

Significantly, the jury in this case was particularly well positioned to evaluate for itself the effect of the interrogation technique on the reliability of Defendant's confession. They were able to observe (and, as the trial unfolded, re-observe) the entire confession captured on videotape. The jury could take note of the surroundings, observe the interactions between law enforcement and Defendant, watch their expressions, and listen to the tones and inflections of their voices.[4] Expert testimony was not needed to draw common-sense inferences from these visual and auditory cues. *See generally United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir.1996) (noting that a jury tasked with deciding whether a person's use of foul and abusive language was intended to harm someone else ordinarily would be able to assess the circumstances without the need for expert testimony, but concluding that such testimony would be necessary where the individual suffered from the medical condition known as Tourette's syndrome).

In sum, the proffered expert testimony to the effect that Defendant's confession was unreliable was both improper under the law and unnecessary in the specific factual context.[5]

---

**4.** It is noteworthy that in one article cited by Professor Hirsch, (Dkt. No. 239, Hirsch Decl. ¶ II n. 1), the principal reform suggested by the authors to reduce the likelihood of false confessions was videotaping all police interrogations. *See* Kassin, et al., *Police–Induced Confessions: Risk Factors and Recommendations*, 34 Law & Hum. Behav. 3, 25 (2010) ("Without equivocation, our most essential recommendation is to lift the veil of secrecy from the interrogation process in favor of the principle of transparency. Specifically, *all* custodial interviews and interrogations of felony suspects should be videotaped in their entirety and with a camera angle that focuses equally on the suspect and interrogator.") (emphasis in original).

**5.** Professor Hirsch was prepared to testify that all three Defendants in this case produced "unreliable" confessions. (Dkt. No. 262, Tr. 2/3/11 at 133.) Significantly, two of these three defendants pled guilty after an extensive colloquy. When asked by the court

2. *"The Interrogation Techniques Used in This Case Increased the Likelihood of Obtaining a False Confession".*

Courts have permitted expert witnesses to testify regarding the risk of a false confession when certain factors beyond the ken of a layperson, such as a diagnosable mental impairment, make a suspect particularly vulnerable to police interrogation. For instance, in *United States v. Shay,* 57 F.3d 126, 131 (1st Cir.1995), the First Circuit held that it was error to exclude a psychiatrist's testimony about a mental disorder known as Munchause's Disease, characterized as an extreme form of pathological lying, offered by the defendant to suggest that he gave a false confession. In *Shay,* the doctor would have testified that the defendant "suffered from a recognized mental disorder that caused him to make false statements even though they were inconsistent with his own self-interest." *Id.* at 133. Such "specialized opinion testimony, grounded in his expertise as a psychiatrist," would obviously not be improper. *Id.*; *see also United States v. Hall,* 93 F.3d 1337 (7th Cir.1996) (expert testimony admissible where psychologist would have testified about defendant's personality disorder making her more susceptible to psychological coercion); *United States v. Roark,* 753 F.2d 991 (11th Cir. 1985) (expert testimony admissible where psychologist would have testified about defendant's condition, known as "compulsive compliance," which made her more susceptible to psychological coercion).

Here, however, Defendant suffered from no psychological or other disability, and, if he had, Professor Hirsch would have been unqualified to opine about it. Instead, Defendant proposed that Professor Hirsch testify that the interrogation techniques employed in this case increased the risk of a false confession. The fatal problem with this proposed testimony is that it lacked *any* objective foundation whatsoever. Professor Hirsch offered absolutely no basis for concluding that the interrogation methods used here had any impact, one way or another, on the truthfulness of the confession.

In his declaration and at the hearing, Professor Hirsch explained that the primary cause of "coerced-compliant" confessions are certain interrogation methods employed by law enforcement, including a widely used method known as the Reid technique. The Reid technique is a trademarked interrogation method developed by the firm of John E. Reid & Associates, Inc., which involves, among other things, isolating suspects from family and friends, confronting them with inculpatory evidence, rebuffing denials of innocence, and minimizing the subject's involvement in the offense. (Dkt. No. 239, Hirsch Decl. ¶¶ VIII–XII.) Beyond his own intuition, however, Professor Hirsch offered no basis for concluding that these tactics had any tendency necessarily to cause false, rather than true, confessions.

Professor Hirsch noted that "the risk of a false confession is heightened by assorted 'situational' factors." (Dkt. No. 239, Hirsch Decl. ¶ XIII.) However, he provided only one example: lengthy interrogations. In support, Professor Hirsch pointed to a study of 125 supposedly "proven" false confessions (discussed in greater detail below) in which eighty-four percent of

"is it your position that in every case where there is a rigorous application of the Reid technique, the resulting confession ... must be deemed to be unreliable?" Professor Hirsch stated, "under normal circumstances, I would give a qualified 'yes.'" (*Id.* at 34.)

Then, noting that he was wary of making a "categorical" statement, he concluded that "the use of the Reid method does not automatically render a confession unreliable." (*Id.* at 34–35.)

those confessions exceeded six hours. *Id.* (citing *The Problem of False Confessions in the Post–DNA World,* 82 N.C. L.Rev. 891 (2004)). He did not elaborate further. Of course, without more, this statistic is virtually meaningless in light of the well-known principle that correlation does not imply causation. It is possible, for instance, that eighty-four percent of the interrogators wore blue jeans, and while this could suggest a strong correlation between blue jeans and false confessions, it would say nothing about a causal link.[6] The article revealed, moreover, that a large number of the interrogations were *considerably* more than six hours, many twelve hours or more.

Apart from the foregoing statistic, Professor Hirsch's declaration offered no other evidence of the danger of certain police interrogation tactics, and the Reid technique in particular, except to say that "the use of these tactics [employed in the Reid technique] and their correlation with false confessions are extensively documented in the literature...." (*Id.* ¶ VIII.) Despite this broad statement, he did not provide any further explanation but, instead, pointed to a list of scholarly articles discussing false confessions generally. (*Id.*)

Defense counsel offered two examples of such literature to the court. One was the aforementioned article by authors Steven A. Drizin and Richard A. Leo titled *The Problem of False Confessions in the Post–DNA World,* 82 N.C. L.Rev. 891 (2004),

which, as noted, examined 125 cases of "proven" false confessions. Nowhere in this study did the authors present evidence that the rate of false confessions increased when any particular interrogation method was used. In fact, the focus of this study was on "vulnerable populations" not present in this case—children, juveniles, the mentally retarded, and the mentally ill—rather than on the interrogation techniques themselves.[7] *See id.* at 963–74.

A second article submitted by defense counsel and relied on by Professor Hirsch was a study conducted by a number of authors in which they collected and analyzed questionnaires presented to 631 police investigators concerning their interrogation practices. *See* Kassin, et al., *Police Interviewing and Interrogation: A Self–Report Survey of Police Practices and Beliefs,* 31 Law Hum. B. 381 (2007). While these questionnaires asked officers generally about their interrogation methods, the study did not attempt to find a correlation, let alone a causal link, between specific interrogation methods and the likelihood of obtaining a false confession. Moreover, only eleven percent of officers reported using the Reid technique, *see id.* at 388, making the study even less relevant to the present case.

At the *Daubert* hearing, Professor Hirsch also mentioned two experiments in which researchers tested certain interrogation techniques—specifically, the tech-

---

6. Professor Hirsch provided no information about the length of all interrogations that eventually ended in confession. Although the study cited by Professor Hirsch noted that "more than 90% of *normal interrogations* last less than two hours," this statistic is entirely unhelpful given that it refers to all police interrogations, not simply those that ended in a confession. *The Problem of False Confessions in the Post–DNA World,* 82 N.C. L.Rev. 891, 946 (2004) (emphasis added).

7. Notably, the authors did not point to evidence showing that the rate of false confessions increased when certain interrogation methods were used even with respect to these particularly vulnerable populations. Moreover, eighty-one percent of false confessions studied in this article involved murder, while only three percent involved arson. Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post–DNA World,* 82 N.C.L.Rev. 891, 945 (2004). Professor Hirsch conceded that this disparity is "statistically significant." (Dkt. No. 262, Tr. 2/3/11, at 97.)

niques of confrontation and minimization, noted above—on college students. The first of these studies, commonly known as "the Alt-key Study," required students to perform a data entry project and warned them not to hit the computer's Alt key, which would cause the computer to crash. The researchers forced the system to crash, falsely accused the students of hitting the Alt key, and confronted them with a "witness" who reported seeing them do so. Under these circumstances, some number of the students signed written confessions despite their innocence. (Dkt. No. 262, Tr. 2/3/11, at 38.)

In the second study, students were given a set of assignments and told that in some assignments collaboration with classmates was acceptable, while in others it was prohibited. The researchers then accused innocent students of improperly collaborating on certain assignments, informed them that they had violated university rules prohibiting cheating, and, for some, minimized the extent of their wrongdoing and encouraged them to take responsibility for their actions. In the group subjected to the minimization techniques, the "confession" rate tripled. (Dkt. No. 262, Tr. 2/3/11, at 40–41.)

Obviously, these "interrogations" were not conducted by law enforcement, were not part of a criminal investigation, did not involve actual suspects, and did not present the students with a serious penalty. As a result, Professor Hirsch readily admitted that these studies have "limited value," (Dkt. No. 262, Tr. 2/3/11, at 38–41, 109), which, in the context of this case, is an understatement.

Professor Hirsch's criticism of the Reid technique appeared, at one point in his testimony, to be that it increased the overall number of confessions, both true and false. (Dkt. No. 262, Tr. 2/3/11, at 35 ("I want to be very clear that, number one, the Reid Technique is too effective. The problem is not that it's ineffective. It breaks down guilty suspects. The problem is that it also breaks down innocent suspects.").) Again, he failed to point to any data supporting even this position,[8] which does not address the central issue here: the relative frequency of *false* confessions and the factors contributing to it.

█ In sum, the proffered expert testimony to the effect that the Reid technique enhanced the risk of an unreliable confession lacked any objective basis for support whatever. Although Professor Hirsch insisted that "there is a wealth of information about the risks of the Reid technique," he could point to none. (Dkt. No. 262, Tr. 2/3/11, at 132.) It is true, as able defense counsel pointed out, that all science is not the same, and in the area of false confessions the kind of strictly mathematical support available in other areas may be lacking. But *some* objective basis other than say-so must be offered, and none was. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.").

As a final point, it is useful to bring up the overworked metaphor that what is sauce for the goose is sauce for the gan-

---

**8.** In fact, an article cited in Professor Hirsch's declaration belies this assertion. *See* Kassin, et al., *Police–Induced Confessions: Risk Factors and Recommendations*, 34 Law & Hum. Behav. 3, 27–28 (2010) (observing that the overall confession rate is higher in the United Kingdom, where police have transitioned "from a classic interrogation to a process of 'investigative interviewing'" and where "the use of psychologically manipulative tactics had significantly declined—without a corresponding drop in the frequency of confessions").

der. If expert testimony is to be permitted from the defense to suggest a confession is false, then similar testimony, from persons with similar, limited expertise, having equally limited objective support, must also be permitted from the government. A single glance at the issue from this perspective makes manifest the deficiencies in the defense testimony proffered here.

### 3. "False Confessions Happen."

The court gave the most extended consideration to this third area of proposed testimony. As the Fourth Circuit has observed, "the phenomenon of false confessions is counter-intuitive and is not necessarily explained by the general proposition that 'jurors know people lie.'" *United States v. Belyea*, 159 Fed.Appx. 525, 529 (4th Cir.2005) (overturning district court's decision to exclude expert testimony regarding false confessions without conducting a full *Daubert* inquiry). In the end, however, three considerations persuaded this court not to allow such testimony.

First, Professor Hirsch was not qualified to testify as an expert on this subject of false confessions for the reasons explained above.

■ Second, Professor Hirsch's testimony would have been so circumscribed as to make it unhelpful. He conceded that it was impossible to provide even a rough estimate of the number of false confessions or the frequency with which they occurred. (Dkt. No. 262, Tr. 2/3/11, at 94, 100–01.) He agreed that there have been hundreds of thousands of confessions reported and

that the number that have been proven false remains in the low hundreds, although he emphasized that "there have been many more than identified." [9] (*Id.*) Given the minimal data that currently exist on this subject, Professor Hirsch's testimony would have been limited more or less to a recent statement made by the president of the website www.falseconfessions.org in a letter to the editor of the *New York Times:* "False confessions happen." Lonnie Soury, Letter to the Editor, March 27, 2011, *available at* http://www.nytimes.com/2011/03/28/opinion/lweb28confession.html. The court concluded that such testimony would not be helpful to the jury.

In fact, without the ability to opine on the alleged dangers of the Reid technique, Professor Hirsch's proposed testimony had become entirely unhinged from the facts of this case, and federal courts of appeals have consistently upheld the exclusion of such testimony. *See United States v. Redlightning*, 624 F.3d 1090, 1112 (9th Cir. 2010) ("Because [the expert] did not reasonably point to any evidence in the record or other factors or data reasonably relied on by experts in his field showing that the FBI gave Redlightning an implied promise of leniency in exchange for his confession or used any other coercive interrogation method that may have lead to a false confession, [the expert] could not provide any relevant testimony to assist the jury."); *United States v. Benally*, 541 F.3d 990, 995–96 (10th Cir.2008) (affirming district court's decision to exclude expert testimony because defendant did not "identify a medical condition that contributed to his

---

**9.** Professor Hirsch did note that, in the aforementioned study involving a review of questionnaires presented to 631 police officers, the officers estimated on average that just under five percent of innocent suspects confessed. (Dkt. No. 262, Tr. 2/3/11 at 94 (citing Kassin, et al., *Police Interviewing and Interrogation: A Self–Report Survey of Police Practices and Be-*

*liefs*, 31 Law Hum. B. 381, 392 (2007)).) However, this study was founded on anecdotal evidence, it did not address the rate of false confessions as compared to true confessions, and Professor Hirsch agreed that "it would be completely speculative" to extrapolate from these findings. (Dkt. No. 262, Tr. 2/3/11 at 94.)

decision to confess" and because general testimony about "the counterintuitive notion that false confessions do in fact occur" held "minimal" relevance); *United States v. Mamah,* 332 F.3d 475, 477 (7th Cir.2003) (affirming district court's exclusion of testimony by defense's putative expert, Dr. Richard Ofshe, on the subject of false confessions because "[w]ithout an indication that [the defendant] was unusually susceptible to the FBI agents' methods of interrogation, Dr. Ofshe could not connect his research to the particulars of [the defendant's] case"); *United States v. Dixon,* 261 Fed.Appx. 800, 805 (5th Cir.2008) (affirming district court's exclusion of expert testimony where the expert "offered only the general proposition that false confessions occur").[10]

Third, and finally, to the extent that the jurors needed to hear that "false confessions happen," the court told them exactly that, repeatedly and emphatically, both during the *voir dire* and in the jury instructions. In pertinent part, the instruction read as follows:

> You should scrutinize this evidence [concerning the defendant's confession] carefully and determine for yourselves the true significance of the defendant Michael Jacques's statements to Trooper Mazza and Special Agent Smythe. It is not uncommon for people to confess honestly to a crime they have committed. It is also known that people, for various reasons, may admit to crimes they did not in fact commit. In weighing the statements made by the defendant Michael Jacques during his questioning you should consider all of the evidence that may assist you in determining the credibility of those statements, including the manner and circumstances of the questioning and any evidence in the case that tends to corroborate or contradict those statements. You may give such weight to the statements made by Michael Jacques during his questioning by Trooper Mazza and Special Agent Smythe as you think they deserve under all the circumstances.

Nothing would have been added by having an expert take the stand and repeat the same sentiment. Indeed, if the court had allowed the proffered testimony, it would have had to permit the government, in fairness, to put on a witness to point out that true confessions also happen, and at a far greater rate than false ones. Little was to be gained, and much potentially lost, by entering this thicket.

### III. CONCLUSION

For the foregoing reasons, the court declined to permit Professor Hirsch's expert testimony.

Only the Fourth Circuit in *Belyea* found the exclusion of such testimony to be improper, and even then, as noted above, the decision turned on the trial court's failure to conduct a full *Daubert* inquiry before reaching its conclusion. *See United States v. Belyea,* 159 Fed.Appx. 525, 529 (4th Cir.2005) (explaining that, without the benefit of a *Daubert* inquiry, it was "impossible to determine whether the expert testimony would aid the jury in this case").