**UNITED STATES of America,
Plaintiff,**

v.

**Steven William DEUMAN,
Jr., Defendant.**

**Case No. 1:11:CR:266.**

United States District Court,
W.D. Michigan,
Southern Division.

Sept. 13, 2012.

**882**

Matthew G. Borgula, Phillip J. Green, U.S. Attorney, Grand Rapids, MI, for Plaintiff.

Richard D. Stroba, Sean Tilton, Federal Public Defender, Grand Rapids, MI, for Defendant.

### MEMORANDUM ORDER GRANTING GOVERNMENT'S MOTION TO EXCLUDE TESTIMONY OF DR. RICHARD LEO

GORDON J. QUIST, District Judge.

The Government has moved to exclude the testimony of Defendant's proffered expert witness, Dr. Richard A. Leo, Ph.D., J.D. The Government argues that Dr. Leo's testimony fails to meet the requirements of Rule 702 of the Federal Rules of Evidence. Defendant has responded, and the Government has filed a reply. The Court has read the parties' submissions and held a Daubert hearing on August 29, 2012, during which it heard testimony from Dr. Leo by video conference.

The Court's decision is based on the parties' briefs and supporting materials, Dr. Leo's affidavit, and the evidence that has been admitted thus far at trial. For the following reasons, the Court will grant the Government's motion and exclude Dr. Leo's testimony.

### I. BACKGROUND

Defendant has listed Dr. Leo as an expert witness in the field of false statements. Defendant states in his disclosure that:

> The defense anticipates that [Dr. Leo] will testify regarding his examination of Mr. Deuman and the alleged statements Mr. Deuman made to government agents and other individuals after his daughter's death; that he will testify specifically regarding Mr. Deuman's statements and why such statements could be and/or are false; that he will testify about conditions and/or circumstances that cause people to make false statements; and that he will testify concerning the bases for his opinions. (Def.'s Disclosure of Experts & Discovery at 3–4 (dkt. # 54).) Defendant indicates that he intends to argue at trial that certain incriminating statements he made to law enforcement officers were false. The statements at issue primarily include statements Defendant made during a car trip on August 17, 2011, in the presence of FBI Agents Robert Birdsong and Frederick Berry and Grand Traverse Band Tribal Police Detective

Richard Campos, as well as statements Defendant made the same day to FBI Agent Bradley Beyer following a polygraph examination. During the *Daubert* hearing, either defense counsel or Dr. Leo indicated that other statements Defendant made may be at issue.

Dr. Leo holds a J.D. and a Ph.D. and is currently an assistant professor of law at the University of San Francisco School of Law, where he has taught since 2006. Additionally, Dr. Leo taught psychology and criminology at the University of California–Irvine from 1997 to 2006. Dr. Leo received his bachelor's degree from the University of California–Berkley in sociology and his masters degree from the University of Chicago in sociology. Dr. Leo's Ph.D., which he obtained from the University of California–Berkley, is in jurisprudence and social policy, which includes specializations in social psychology, criminology, and sociology as they relate to legal institutions and law. Dr. Leo has conducted extensive research on police interrogation, the psychology of interviewing and confessions, false confessions, and erroneous convictions. He has published numerous articles and books, many of which have appeared in peer-reviewed journals. Dr. Leo has also taught courses and lectured to law enforcement agencies on false confessions and techniques for obtaining reliable confessions.

Dr. Leo and other social scientists have conducted empirical research showing that most jurors are unfamiliar with police interrogation techniques, the effects of those techniques, and the phenomenon of false confessions. *See, e.g.,* Richard A. Leo & Brittany Liu, *What Do Potential Jurors Know About Interrogation Techniques and False Confessions?,* 27 Behav. Sci. & L. 381 (2009). This research discloses misconceptions, lack of knowledge, and biases concerning interrogation techniques, psychological behaviors, and false confessions.

In particular, studies show that jurors are reluctant to believe that an innocent person would falsely confess to a crime because false confessions are counterintuitive.

In a law review article published in 2004, Dr. Leo and Dr. Steven A. Drizin, a professor of law at Northwestern University School of Law, analyzed 125 recent cases determined to be "proven false confessions." *See* Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post–DNA World,* 82 N.C. L.Rev. 891 (2004). The authors classified the 125 confessions as "proven false confessions" based on four criteria providing objective confirmation that the confession was false: (1) proof that the crime did not happen, e.g., three developmentally disabled defendants confess to murdering a defendant's newborn baby but later-obtained evidence shows that such defendant was medically incapable of having a child; (2) the defendant could not have committed the crime, e.g., the defendant was incarcerated at the time the crime was committed; (3) the true perpetrator of the crime, whose guilt can be objectively verified, was subsequently apprehended; and (4) reliable scientific evidence excludes the defendant as the perpetrator, e.g., DNA testing. *See id.* at 925–26. This study differed from a 1998 study Dr. Leo conducted with Dr. Richard J. Ofshe, *see* Richard A. Leo & Richard J. Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation,* 88 J.Crim. L. & Criminology 429 (1998), which classified the studied interrogation-induced confessions as "proven," "highly probable," and "probable," by limiting the studied confessions only to those that could be objectively verified as false. *See* Drizin & Leo, 82 N.C. L.Rev. at 924–25. Dr. Leo's research and analysis of false confessions relies principally upon documents such as

newspaper accounts, court documents, transcripts, police reports, and published appellate opinions.

Dr. Leo also contributed to a consensus document, or "white paper," published in 2010 by the American Psychology–Law/Division 41 of the American Psychological Association. *See* Saul M. Kassin et al., *Police–Induced Confessions: Risk Factors and Recommendations*, 34 Law & Hum. Behav. 3 (2010). This peer-reviewed article compiled the existing research concerning false confessions and, among other things, identified police interrogation techniques found to lead to false confessions, identified personality characteristics that render individuals particularly susceptible to making false confessions, and concluded with policy recommendations, namely, that law enforcement officers record interrogation sessions.[1]

Dr. Leo's research has identified two types of interrogation-induced false confessions: "compliant false confessions," which occur where the confessor seeks to end police questioning by admitting to guilt; and "persuaded" or "internalized" false confessions, in which the confessor comes to believe that he must have committed the crime. *See* Richard A. Leo, *False Confessions: Causes, Consequences, and Implications*, 37 J. Am. Acad. Psychiatry & L. 332, 338–39 (2009).

If permitted to testify as an expert in this case, Dr. Leo would explain: (1) that false confessions or incriminating state-ments are counterintuitive; (2) why confessions are prejudicial; (3) risk factors for false confessions, such as interrogation techniques; and (4) the framework for how false confessions occur. Dr. Leo would not offer an opinion as to whether Defendant lied or made false statements or whether Defendant's statements are unreliable.

Following the *Daubert* hearing, defense counsel submitted a lengthy affidavit from Dr. Leo, which discusses: (1) the background of Dr. Leo's research into false confessions; (2) his theory about the three decision points that lead to a false confession, i.e., the police decision to classify an individual as a suspect; use of psychological interrogation tactics as a means to move the suspect from denial of guilt to admission; and solicitation of a post-admission narrative from the suspect, in which the suspect provides an account of the crime that may be contaminated with non-public crime facts mentioned by the interrogator; (3) Defendant's account of events demonstrating that during and subsequent to the August 17, 2011, polygraph examination, the FBI agents used coercive interrogation techniques that can lead to false confessions; and (4) "dispositional" risk factors related by Dr. William Sanders that render Defendant more susceptible to making a false confession.

## II. ANALYSIS

Federal Rule of Evidence 702 provides:

---

**1.** The Court finds it noteworthy that the authors of the "white paper" undertake a normative comparison of interrogation procedures in the United States and England. In concluding that investigative practices in England are "less confrontational" and "fairer and more transparent" (page 13), the authors omit the highly relevant fact that courts in England and Wales may draw negative inferences from an accused's silence during interrogation. *See* Criminal Justice and Public Order Act of 1994, c. 33, Pt III, § 34.

Quite the opposite, in the United States, accused persons have long had the right to remain silent during interrogation, and silence may not be used in court to draw negative inferences about culpability. *See, e.g., Miranda v. Arizona*, 384 U.S. 436, 468, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As such, the authors' comparison seems somewhat deceptive. This omission, therefore, raises concerns about the reliability of the authors' objectivity, analysis, and recommendations for interrogation.

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. Pursuant to Rule 702, a court's role as to expert testimony is that of a gatekeeper, in which it must assess the reasoning and methodology behind the expert's opinion and determine whether it is both scientifically valid and relevant to the facts of the case. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 2798–99, 125 L.Ed.2d 469 (1993). In *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Court extended *Daubert*'s gatekeeping function beyond scientific testimony to all forms of expert testimony.

In *Daubert,* the Supreme Court identified certain factors that may bear on whether an expert's testimony is reliable, including: (1) whether a theory or technique can be or has been tested; (2) whether the technique has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error and the existence of standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance in a relevant scientific community. *See id.* at 593–94, 113 S.Ct. at 2796–97. The *Daubert* factors are "neither definitive nor exhaustive," as all, some, or none of them may be pertinent to the reliability of expert testimony in a particular case. *Mike's Train House, Inc. v. Lionel, L.L.C.,* 472 F.3d 398, 407 (6th Cir.2006); *see also Thomas v. City of Chattanooga,* 398 F.3d 426, 432 (6th Cir. 2005) (noting that "the lower courts have flexibility in the application of the [*Daubert*] factors, because it may not make sense to apply some of the *Daubert* factors, such as the rate of error analysis, to non-scientific testimony"). Whatever factors a court employs, its role in ferreting out unreliable testimony is significant because jurors are likely to give special weight to expert testimony. *See Jinro Am. Inc. v. Secure Invs., Inc.,* 266 F.3d 993, 1004 (9th Cir.2001).

The Government concedes that Dr. Leo is an expert in the area of false confessions and, based on Dr. Leo's research and experience, the Court finds Dr. Leo qualified as an expert on the subject of factors that seem to be common in proven false confessions. The Government argues, however, that the Court should exclude Dr. Leo's testimony because, among other things, there is no evidence that Defendant confessed to murdering his daughter, Dr. Leo is not an expert in "false statements," Dr. Leo's research on false confessions has no bearing on this case, and, even if Defendant concedes that he confessed, there is no evidence of record in this case to support Dr. Leo's theory of false confessions. The Court will assume that Dr. Leo's false confession expertise and theory would also extend to false incriminating statements. After all, a false confession is simply a type of false statement that includes an admission of a fact tending to show guilt, *see Wheat v. Thigpen,* 793 F.2d 621, 633 (5th Cir.1986) ("A confession is an admission of guilt."); *Ex Parte Cobb,* 448 F.Supp. 886, 893 (D.S.C.1977) ("A confession implies that the matter confessed constitutes a crime, and it is limited in nature and in its precise scope and meaning to the

criminal act itself." (citing 23 C.J.S. Criminal Law § 816 at 150)), and there is no reason to believe that the same psychologically coercive interrogation techniques that may lead to false confessions might not also induce false statements that do not amount to confessions. Even so, the Court will exclude Dr. Leo's testimony because his theories are both unreliable and irrelevant to the facts of this case, and any limited probative value they might have is substantially outweighed by the potential dangers of undue prejudice and misleading the jury.

### *Reliability*

■ In *Corley v. United States,* 556 U.S. 303, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009), Justice Souter wrote that "there is mounting empirical evidence that [custodial police interrogation] can induce a frighteningly high percentage of people to confess to crimes they never committed." *Id.* at 321, 129 S.Ct. at 1570 (citing Drizin & Leo, *supra*). In this Court's judgment, however, Dr. Leo's research on false confessions and his theories based on that research are not sufficiently reliable to be of assistance to the jury in understanding the evidence or determining a fact in issue in a particular case. As indicated above, Dr. Leo's research method essentially involves reviewing false confession cases, determining whether they can be classified as "proven false confessions" by applying the four objectively-based criteria mentioned above, and comparing the interrogation techniques the police used in such cases in order to find common variables that may have induced the proven false confession. Although this research confirms that false confessions do, in fact, occur and that certain coercive interrogation techniques *may* lead to false confessions, Dr. Leo's theory, at least at this stage in its development, provides neither a useful nor appropriate basis to assist a jury in assessing whether a particular confession, or even incriminating statement, was false.

As Dr. Leo forthrightly admits, despite extensive research and review of false confession cases, his methodology cannot accurately predict the frequency and causes of false confessions. *See* Drizin & Leo, 82 N.C. L.Rev. at 931; *see also State v. Wooden,* No. 23992, 2008 WL 2814346, at *4 (Ohio Ct.App. July 23, 2008) (noting that Dr. Leo's research "has not led to any concrete theories or predictors about when and why false confessions occur"). His theories cannot discern whether a certain interrogation technique, used on a person with certain traits or characteristics, results in a predictable rate of false confessions. In addition, he has formulated no theory or methodology that can be tested. *See People v. Kowalski,* 492 Mich. 106, 132–34, 821 N.W.2d 14 (2012) (affirming the trial court's exclusion of Dr. Leo's testimony under Michigan Rule of Evidence 702, in part, because Dr. Leo's research could not be tested, could not be subjected to a rate of error analysis, and could not estimate the frequency of false confessions). While the Court is aware that some laboratory studies, such as the ALT key study by Professors Kassin and Perillo, suggest that coercive interrogation tactics produce a significant rate of false confessions, such studies shed no light on real-world interrogation practices and results because they "were not conducted by law enforcement, were not part of a criminal investigation, did not involve actual suspects, and did not present the students with a serious penalty." *United States v. Jacques,* 784 F.Supp.2d 59, 66 (D.Mass. 2011). Moreover, as Dr. Leo testified at the *Daubert* hearing, there is no way of knowing how frequently false confessions occur in the real world.

The other side of the coin, of course, is that coercive interrogation techniques also

result in true confessions, likely more frequently than false confessions. *See Wooden*, 2008 WL 2814346, at \*4 (noting Dr. Leo's testimony that "coercive techniques are also effective in inducing true confessions"); *Jacques*, 784 F.Supp.2d at 67 (citing proffered expert's concession that only several hundred out of several hundred thousand reported confessions have been proven false). As is the case with false confessions, however, there is no reliable means at this point in time of predicting or determining with any degree of certainty—absent, perhaps, an independent and unrefutable evidentiary basis, such as the types of evidence used to confirm the false confessions included in Dr. Leo's 2004 study—whether a particular confession or incriminating statement is true. The impediment to more concrete analysis in this area is, as Dr. Leo explains, the absence of a reliable body of real-world data that can shed light on the extent of the problem of false confessions:

> [S]cholars do not know how frequently interrogation-induced false confessions occur or how frequently (or what percentage of) interrogation-induced false confessions lead to the wrongful conviction of the innocent. As Leo and Ofshe have pointed out, this is not only because no organization collects data on the annual number of interrogations and confessions, but also because most interrogations are not recorded (thus preventing researchers from obtaining an objective record of the cause of the disputed confession). It is therefore difficult, if not impossible, in some cases to authoritatively determine the underlying truth or falsity of the confession. Until these barriers are overcome, researchers will not be able to provide a scientific or authoritative estimate either of the frequency of interrogation-induced false confession or of the rate at which they lead to miscarriages of justice.

Drizin & Leo, 82 N.C. L.Rev. at 931 (footnotes omitted).

This Court recognizes that other courts have often permitted false confession expert testimony to explain how a defendant's mental illness or retardation or personality trait rendered the defendant more susceptible to coercion or persuasion. For example, in *United States v. Shay*, 57 F.3d 126 (1st Cir.1995), the defendant was convicted of conspiring to blow up his father's car. As part of his defense, the defendant sought to offer testimony from a psychiatrist who would have testified that the defendant suffered from a recognized mental disorder known as "pseudologia fantastica," which caused the defendant to tell fantastic lies that placed him at the center of attention. The district court excluded the testimony on the ground that it would not assist the jury in light of other evidence in the record concerning the reliability of the defendant's testimony. The First Circuit held that the district court erred in its analysis because "whether or not the jury had the capacity to *generally* assess the reliability of these statements in light of the other evidence in the case, it plainly was unqualified to determine without assistance the *particular* issue of whether Shay Jr. may have made false statements against his own interests because he suffered from a mental disorder." *Id.* at 133; *see also United States v. Hall*, 93 F.3d 1337 (7th Cir.1996) (concluding that the district court erred in excluding the testimony of a psychologist who would have testified about the defendant's mental condition that rendered him more susceptible to coercive interrogation techniques); *State v. Oliver*, 280 Kan. 681, 698–99, 124 P.3d 493, 506 (2005) (distinguishing *State v. Cobb*, 30 Kan.App.2d 544, 43 P.3d 855 (2002), and noting that "[i]t is clear that *Cobb* did not deal with the particular psychological makeup of the defendant or with the potential for interaction between that

makeup and interrogation techniques used by law enforcement. It dealt only with the techniques themselves."); *State v. Pate,* No. M2009–02321–CCA–R3–CD, 2011 WL 6935329, at *12 (Tenn.Crim.App. Nov. 22, 2011) (holding that the trial court did not err in allowing the defendant's expert to testify about the defendant's particular personality traits and mental conditions that rendered him more susceptible to suggestion than other people). It is also worth noting that a significant number of the proven confessions in Dr. Leo's 2004 study involved "vulnerable populations" that included children, juveniles, and mentally ill and developmentally disabled persons. *See* Drizin & Leo, 82 N.C. L.Rev. at 964–74.

There is no evidence in the record that Defendant suffers from a mental illness or a personality trait that renders him unusually susceptible to coercive interrogation techniques. Although Dr. Leo states in his affidavit that Dr. William Sanders has said that Defendant is "impulsive, has poor attention and memory, suffers from fetal alcohol effects, and suffers from intermittent explosive disorder, and anti-personality disorder," (Leo Aff. ¶ 27), Dr. Sanders is not going to testify in this case, and Dr. Leo is not qualified to render an opinion on whether these conditions render Defendant unusually susceptible to coercive interrogation tactics or making false confessions.[2] Defendant's mother has testified about the effects of fetal alcohol syndrome on Defendant, but she did not testify that it renders him more vulnerable to coercive threats or persuasion or may cause him to make false incriminating statements. To the contrary, she said that Defendant tends to blame others.

Defendant argues that Dr. Leo's testimony satisfies *Daubert*'s standard of reliability because Dr. Leo's research and analysis has been subjected to peer review and can be tested. Yet, that a theory or method can be peer reviewed and tested does not mandate admission. For example, even polygraph techniques—which courts repeatedly exclude as unreliable—can be tested and subjected to peer review. *See, e.g., United States v. Cordoba,* 194 F.3d 1053, 1059 (9th Cir.1999). To be sure, as Defendant has argued, social science is a type of "soft" science "in which the research, theories and opinions cannot have the exactness of hard science methodologies." *Jenson v. Eveleth Taconite Co.,* 130 F.3d 1287, 1297 (8th Cir.1997). Even so, the evidence must still be reliable. *Id.* at 1298. While the problem of false confessions is indeed real, false confession testimony of the type Dr. Leo can offer is nothing more than guesswork: coercive interrogation techniques may lead to false confessions but also produce true confessions, and such techniques were used in this case, so the confession or incriminating statements may or may not be false. The danger of allowing such testimony, then, is that the jury may conclude that Defendant's incriminating statements were false not because there is a sound evidentiary basis for doing so, but because Dr. Leo, an impressively-credentialed expert, says "it is so." As the Supreme Court has observed:

> [C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to ad-

---

2. The Court notes that Defendant's anti-personality disorder renders his version of events, as related to Dr. Leo and upon which Dr. Leo relies in his affidavit, especially suspect. According to the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (rev. 4th ed.2000), "deceit and manipulation are central features" of this disorder. *Id.* at 702.

mit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997).

### *Relevancy*

■ Apart from reliability, Dr. Leo's research and theories do not fit with the facts at issue. *See United States v. Langan*, 263 F.3d 613, 623 (6th Cir.2001) (stating that "a district court may admit the evidence only if such testimony will assist the trier of fact in understanding the evidence or in determining a fact at issue"). To put it bluntly, other than presenting a murder, from a factual standpoint this case is not even close to the cases Dr. Leo has identified as involving false confessions. The bulk of Dr. Leo's work has focused on what occurs in the interrogation room when police use well-recognized interrogation techniques, such as those taught by Inbau and Reid, *see, e.g.,* F. Inbau, J. Reid & J. Buckley, *Criminal Interrogation and Confessions* (3d ed.1986), as a means to obtain a confession. For example, the authors of the "white paper" describe a well-known interrogation approach known as the "Reid" technique (developed by John Reid in collaboration with Fred Inbau) as follows:

> First, investigators are advised to isolate the suspect in a small private room, which increases his or her anxiety and incentive to escape. A nine-step process then ensues in which an interrogator employs both negative and positive incentives. On one hand, the interrogator confronts the suspect with accusations of guilt, assertions that may be bolstered by evidence, real or manufactured, and refuses to accept alibis and denials. On the other hand, the interrogator offers sympathy and moral justification, intro-

ducing "themes" that minimize the crime and lead suspects to see confession as an expedient means of escape.

Kassin et al., 34 Law & Hum. Behav. at 7. This case is different. First, the FBI Agents did not haul Defendant into an interrogation room and subject him to hours of questioning in isolation with the goal of obtaining a confession. Instead, Defendant volunteered to take a polygraph test. Defendant then traveled by car with Agents Birdsong and Berry and Detective Campos from Traverse City to Flint in order to take the test. Although the FBI Agents questioned Defendant about the murder after informing him that he failed the polygraph test, there is no indication that they applied the type of coercive interrogation techniques taught by Inbau and Reid that Dr. Leo argues may lead to false confessions. Second, the evidence shows that the statements Defendant made following the polygraph examination and during the return trip to Traverse City were not prompted or influenced by the FBI Agents. Instead, the evidence shows that Defendant made similar statements to others prior to August 17, 2011. For example, Dr. Leo states that the FBI agents suggested the possibility of "shape-shifting" or "bear walking" to explain how Defendant could have killed his daughter, but Natasha Maitland, E.D.'s mother and Defendant's then-girlfriend, testified that Defendant's aunt suggested to Defendant the evening of August 16, 2011—the night before the polygraph examination—that Defendant could have been "bear walked" (which, according to testimony, is "shape shifting"). Third, contrary to Defendant's assertion, this is not a case where Defendant's statements are the only evidence of the crime, such that Dr. Leo's testimony might be more important to explain how and why Defendant could have made false statements to the FBI agents. There is ample evidence, such as the condom containing E.D.'s DNA on the outside and

Defendant's DNA on the inside, connecting Defendant to the murder. Finally, Defendant never confessed to the crime. Thus, the last of the three sequential errors that Dr. Leo claims occur in the production of *every* false confession—the jointly-shaped postadmission narrative by the suspect often containing public and non-public facts supplied by the police, *see* G. Daniel Lassiter & Christian A. Meissner, *Police Interrogations and False Confessions* 12–13 (Am. Psychological Ass'n 2010) (chapter authored by Richard A. Leo & Steven A. Drizin titled *The Three Errors: Pathways to False Confession and Wrongful Conviction*)—never occurred. *See Scott v. State,* 165 S.W.3d 27, 55 (Tex.App.-Austin 2005) ("[Dr.] Leo said that it is impossible to determine whether a particular confession is true or false just by looking at the interrogation techniques that produced the confession. Instead, one must examine the 'post-admission narrative,' that portion of the interrogation after the person admits guilt, to determine whether or not the narrative contains details that the true perpetrator would be expected to know and that are consistent with the known facts."), *rev'd on other grounds,* 227 S.W.3d 670 (Tex.Crim.App.2007).

Thus, as shown, there are significant differences between the instant case and the false confession cases that Dr. Leo has studied, and nothing indicates that Dr. Leo's research, methods, and theories are applicable under these circumstances. *Cf. United States v. Redlightning,* 624 F.3d 1090, 1109–11 (9th Cir.2010) (affirming the district court's exclusion of false confession expert testimony on the grounds that there was no evidence that law enforcement officers had used a coercive interrogation tactic when interviewing the defendant).

### Rule 403

■ Apart from the foregoing reasons, the Court concludes that even if Dr. Leo's testimony is relevant, it should be excluded because it has minimal probative value but significant potential for unfair prejudice. Pursuant to the Federal Rules of Evidence, a court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, [or] misleading the jury...." Fed.R.Evid. 403. In the Court's judgment, Dr. Leo's testimony might be useful to inform the jury about the phenomenon of false confessions. There is no reason to believe that the average juror is familiar with law enforcement interrogation practices has ever been exposed to such practices, or knows that certain coercive practices have actually led to false confessions. In this regard, this Court agrees with the Michigan Supreme Court's conclusion in *People v. Kowalski,* 492 Mich. 106, 821 N.W.2d 14 (2012), that false confession claims are beyond the common knowledge of the average juror and that expert testimony on the subject may be admitted to assist jurors, so long as it meets the other requirements for admissibility. *Kowalski,* 492 Mich. at 128–30, 821 N.W.2d 14. But, for the reasons stated above, Dr. Leo's testimony really adds nothing to the case. Defendant did not confess, so there can be no false confession, and there are no facts in the record showing the type of circumstances that could possibly lead to a false confession. On the other hand, the potential for undue prejudice and misleading the jury is significant because the jury may well assign undue weight to Dr. Leo's testimony in deciding issues of credibility, even though his testimony itself has little to do with the case.[3] In addition, it would be a waste of

---

**3.** Defendant also argues that he has a constitutional right to present a complete defense, including evidence regarding the physical and psychological environment in which he made the statements to the FBI agents. Defendant asserts that this right includes the presenta-

everyone's time for Dr. Leo to testify regarding police tactics that in some cases lead to false confessions when those tactics did not occur here.

As indicated at oral argument, the Court believes that a jury instruction can adequately inform the jury that suspects do make false confessions or incriminating statements. The Court has not decided at this juncture whether such an instruction is necessary or even appropriate, but it offers the instruction given in *United States v. Jacques*, 784 F.Supp.2d 59 (D.Mass.2011), as an example. The parties, of course, are free to propose their own instructions if they wish.[4]

### III. CONCLUSION

For the foregoing reasons, the Government's Motion In Limine To Exclude Testimony Of Dr. Richard Leo (dkt. # 56) is **GRANTED.**

### IT IS SO ORDERED.

---

tion of expert testimony to assist the jurors in police interrogation techniques, psychological issues involved in interrogation, and why people make false self-incriminating statements. While Defendant is correct that he must be afforded a meaningful opportunity to present a complete defense, *see Crane v. Ky.*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986), the right to present evidence "is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 1264, 140 L.Ed.2d 413 (1998). Rules 403 and 702 of the Federal Rules of Evidence, which the Court applies in this case, are two such limitations. Moreover, Defendant is not precluded from presenting evidence about the circumstances of the questioning because he may testify about the circumstances of the questioning and how they influenced his statements. *See United States v. Belyea*, 159 Fed.Appx. 525, 531 (4th Cir.2005) (noting that even without a false confessions expert the defendant was able to challenge his confession at trial "by testifying that he made up most of it and by highlighting discrepancies between his confession and the remaining evidence of the crime").

---

### ADDENDUM TO MEMORANDUM ORDER GRANTING GOVERNMENT'S MOTION TO EXCLUDE TESTIMONY OF DR. RICHARD LEO

#### *Instruction Given To The Jury*

The following instruction was given in the trial:

If you believe that the defendant made false statements in an attempt to lead others to believe he did not commit these crimes, then you may consider this conduct, along with all the other evidence, in deciding whether the government has proved beyond a reasonable doubt that he committed the crimes charged. This conduct may indicate that he thought he was guilty and was trying to avoid punishment.

You have heard the testimony that defendant made certain statements to FBI agents and to Detective Campos. It is not uncommon for people to make true statements that tend to be incriminating, and it

---

4. The *Jacques* instruction stated:

You should scrutinize this evidence ... carefully and determine for yourselves the true significance of the defendant Michael Jacques's statements to Trooper Mazza and Special Agent Smythe. It is not uncommon for people to confess honestly to a crime they have committed. It is also known that people, for various reasons, may admit to crimes they did not in fact commit. In weighing the statements made by the defendant Michael Jacques during his questioning you should consider all of the evidence that may assist you in determining the credibility of those statements, including the manner and circumstances of the questioning and any evidence in the case that tends to corroborate or contradict those statements. You may give such weight to the statements made by Michael Jacques during his questioning by Trooper Mazza and Special Agent Smythe as you think they deserve under all the circumstances.

*Jacques*, 784 F.Supp.2d at 68.

is not uncommon for people to make false incriminating statements. In weighing the statements made by the defendant while he was with the officers, you should consider all of the evidence that may assist you in determining the reasons for those statements, including the manner and circumstances of the questioning, and any evidence in the case regarding why the defendant made those statements. You may give such weight to the statements made by defendant as you think they deserve under all the circumstances

It is up to you to determine the significance of defendant's statements.